[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1164 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1165 
The appellant was indicted and tried for the capital felony of robbery when the victim was intentionally killed by the defendant. The jury found him guilty and fixed punishment at death. After a separate hearing on aggravating and mitigating circumstances, the trial judge accepted the penalty as fixed by the jury and sentenced him accordingly.
On Saturday, April 30, 1977, the appellant was a state prisoner in the Wilcox County Jail and was classified as being on "work release" status. Between 7:00 and 7:30 that morning, he was released into the custody of the victim, Roland Cooper, the Probate Judge of Wilcox County. The appellant worked around the Cooper home most of the day, cutting grass and doing other minor jobs. Late that afternoon Cooper and the appellant drove to a garden located about a mile from the residence. They were in Cooper's blue station wagon, commonly known as a Jeep Wagoneer. Cooper's son saw his father and the appellant driving to the garden around 5:00 p.m.
Deputy Sheriff Bobby Young and Walter Sheffield discovered the body of Cooper some time after 8:00 p.m. on that date. They had gone to the garden looking for the missing victim and had found blood and "drag marks" in the freshly plowed ground. They followed the marks and found the body of Cooper in a wooded area, "face down with his hands tied behind him." The body was partially covered with leaves and limbs.
There were several wounds to the head of the body, and it was determined that death was caused by "acute intercranial hemorrhage . . . subsequent to massive fracturing of the skull." The wounds were described by Richard Roper, a State Toxicologist, as having been made by "an instrument which would have some type of cutting edge . . . which could also deliver a substantial blow of crushing force to the skull." The death weapon was an 18-inch iron or steel bar normally used as a depth gauge on the rear of a garden tiller and described as a "tiller guide bar."
The victim's billfold was found about midway between where the blood stains were and the garden entrance. Three of the victim's credit cards were found about twenty feet from where the billfold was found. The victim usually carried $150 to $200 in his billfold, according to his wife. His post office box key, which he kept in his billfold, was found on the front seat of the jeep the next day when his son retrieved the vehicle from the Selma Police Department.
Around 6:00 p.m. on May 30, Chester Gregory, an acquaintance of Cooper, saw the appellant driving the victim's jeep toward Selma. Joy Snell, another witness, observed a young black male driving the victim's vehicle toward Selma at approximately the same time. Neither witness saw Cooper in the vehicle. Later Selma Police Officer Joseph McGrew stopped and arrested the appellant for driving while intoxicated at about 8:20 p.m. in Selma. The appellant was driving the blue Jeep Wagoneer registered to the victim. The vehicle was taken to the police station and locked, and the appellant was placed in the rear seat of the police car and taken to jail.
Officer McGrew testified that he read the appellant theMiranda warning upon taking him into custody. After laying a proper Miranda and voluntariness predicate, the witness testified that upon radioing the vehicle tag number to headquarters and receiving a reply that it was registered to Roland Cooper, the appellant volunteered that Cooper was his "boss man." The appellant further stated that Cooper was out at the Selma mall, and he was trying to find his way back there to pick him up. *Page 1166 
Selma Police Officer Ernest Dufour was on duty the night in question. He drove the Jeep Wagoneer back to the police station and turned the keys over to his captain. He observed the appellant in the patrol car and at the scene of the arrest as well as at the police station. After proper Miranda and voluntariness predicates were laid, a statement made by the appellant to Officer Dufour that night was admitted into evidence:
 "Q. While you were getting the information before Mr. Chestnut stopped us, on the face Exhibit No. 24, the yellow sheet there, you said you asked him for his driver's license, what did he tell you.
"A. He didn't have any.
"Q. And you said you asked him his name?
"A. Right.
"Q. And what did he tell you?
"A. Stated his name was Charles Lee Burford (sic).
 "Q. All right. Did he make any statements to you after he told you his name, without you asking him any questions?
 "A. Before I could say anything else, he asked me could he call his boss.
* * * * * *
"Q. All right. What did you say to him?
"A. I asked him who was his boss.
"Q. What did he say?
"A. Said it was Judge Cooper.
"Q. Did you know who Judge Cooper was at that time?
"A. No, sir, I didn't know who he was.
 "Q. All right. Now, did you ask him anything about Judge Cooper?
"A. I asked him where was the Judge at.
"Q. All right. And what did he say?
"A. He said he left him in a garden.
* * * * * *
 "Q. All right. Did he say anything else about leaving him [in] the garden?
 "A. Well, he stated that the Judge asked him to go get some fertilizer, to take the jeep and go get some fertilizer. He said he done what the Judge asked him to do, but he kept going.
* * * * * *
"Q. Did he say anything else?
 "A. He stated to me that he had wanted to run for a long time and this was his chance and he took it.
* * * * * *
"Q. And did he say anything about where he was going.
"A. He said he was going to Selma.
* * * * * *
 "Q. Did he ever say anything to you what his final destination was going to be?
 "A. Well, then, he told me that he was going to catch a plane, go to Birmingham to catch a plane.
* * * * * *
 "Q. Did he ever say anything to you about his relationship with the Judge when he was talking to you?
 "A. Yes. He said the Judge was his best friend; that he liked him a lot.
 "Q. The Judge was his best friend and he liked him a lot. Did he say anything about working for the Judge?
 "A. He said the Judge always used to use him when he needed any work done."
At 11:00 p.m. on the date in question, Selma Police Officer Larry Hart took over the police car which Officer McGrew had used to transport the appellant to jail. As he was going off his shift at 7:00 a.m. the next morning, he discovered on the rear floorboard $106, a black comb, and a silver key. The key was identified by the victim's son as being to the county radio system used in the victim's vehicle. At the time of the appellant's booking, he had in his possession $40.35 and a set of keys to the Jeep Wagoneer.
At 10:15 p.m. on April 30, the appellant signed a "Statement of Rights Form" in the presence of Captain James Foster of the Selma Police Department. After laying proper predicates as to the voluntariness of the appellant's statement and as to theMiranda warning, Captain Foster testified concerning his questioning of the appellant. *Page 1167 
He said that the appellant told him Cooper was "at the cabin." The appellant said Cooper came to the jail and picked him up that morning to cut grass at his cabin. That afternoon they went to the garden to plant some corn. He said Cooper cursed him for planting the corn wrong and began showing him how to plant it properly. From the record:
"Q. All right. What did he say happened then?
 "A. He said that he had — he was ahead of Mr. Cooper. He had walked on out to the end of the row and turned around facing Mr. Cooper. Mr. Cooper was bent over dropping corn.
 "Q. What did he — did he — what did he say happened then?
 "A. Said that he noticed this piece of metal that had come off of the tiller, laying on the ground. He reached down and picked it up.
"Q. What, if anything, did he say he did with it?
 "A. Said when Mr. Cooper walked up to the edge of the row, bent down planting the corn, that he hit him.
"Q. What else did he say, if anything?
 "A. Said that Mr. Cooper fell that he was making a racket, moaning and he hit him again while he was on the ground.
"Q. What did he say he did then, if anything?
 "A. Said that he then got him by the feet, pulled him out of the garden, over toward some woods.
"Q. What did he say he did, then, if anything?
 "A. Said when he got over toward the woods that he got his billfold, that he attempted to cover Mr. Cooper up with some leaves and branches.
 "Q. Okay. Was that everything he told you about on that occasion on the night of April the 30th, 1977?
"A. It is."
The shirt and trousers which the appellant was wearing on April 30 were turned over to the state crime lab on May 1, and human blood was found on both garments. A latent thumbprint of the appellant was found on the left rear door handle of the jeep. Two brown paper bags found inside on the front floorboard of the vehicle contained fingerprints and a palmprint of the appellant.
When the State rested its case in chief, the defense announced "Charles Bufford rests," whereupon both sides commenced closing arguments to the jury. No motion to exclude the State's evidence was filed at that time, and no request for the affirmative charge was made.
 I
The Alabama capital felony statute is constitutional. Jacobsv. State, Ala.Cr.App., 361 So.2d 607 (1977), affirmed, Ala.,361 So.2d 640 (1978), cert. denied, 439 U.S. 1122,99 S.Ct. 1034, 59 L.Ed.2d 83 (1979); Clements v. State, Ala.Cr.App.,370 So.2d 708, affirmed in part, reversed in part on another ground, Ala., 370 So.2d 723 (1978); Watters v. State, Ala.Cr.App., 369 So.2d 1262, reversed on other grounds, Ala.,369 So.2d 1272, on remand, 369 So.2d 1275 (1978); Colley v.State, Ala.Cr.App. [Ms. September 4, 1979]; Evans v. State, Ala.Cr.App., 361 So.2d 654, affirmed in part, reversed in part on another ground, Ala., 361 So.2d 666 (1977); Evans v.Britton, 472 F. Supp. 707 [S.D.Ala., 1979].
 II
The appellant contends he was denied a speedy trial in violation of Article I, § 6, Constitution of Alabama 1901 and the Sixth Amendment to the United States Constitution.
The record reveals that the appellant was arrested on the instant charge on May 4, 1977. He was indicted at the next regular session of the grand jury on November 7, 1977. The trial began on March 6, 1978, with hearings on various motions and ended on March 10 with a jury verdict of guilt.
Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101
(1972), sets out four factors to be considered in determining whether there has been a denial of a speedy *Page 1168 
trial: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) prejudice to the defendant. There is no fixed length of time that is considered to be per se unreasonable. Andrews v. State, Ala.Cr.App., 370 So.2d 1070 (1979), cert. denied, Ala.,370 So.2d 1075.
In the instant case we find (1) the length of delay from arrest to trial date to have been ten months. From arrest until arraignment, nine months elapsed.
(2) The reason for the delay was due to the fact that no regular grand jury met from the date of arrest until November 1977. The appellant was indicated by the first grand jury impaneled after his arrest. Several intervening factors also influenced the delay.
On May 10 Charles H. Sims, III, and C.W. Blackwell, Jr., were appointed as attorneys for the appellant. Each filed a motion for recusal from the appointment. Sims withdrew because this case would have been his second recent appointment in a major, notorious criminal case requiring many hours of preparation and trial work. As he was a single practitioner, the hardship to his practice would have been excessive. Blackwell was excused because he was a personal friend of the victim, having had "political and social and business connections" with him and, therefore, could not in good conscience represent the appellant adequately.
On July 28, 1977, P.H. Pitts and J.W. McDowell were appointed to represent the appellant. Both likewise filed motions to withdraw as counsel. McDowell had not had "five years prior experience in the active practice of criminal law" as required by § 13-11-8, Code of Ala. 1975. Pitts was a personal friend of the victim and had political contacts with him, and McLean Pitts of the same law firm was a close personal friend of the victim and on occasion represented him and members of his family.
The December 12, 1977, term of criminal cases in Wilcox County was cancelled by the circuit judge on November 30, 1977, because only one case was on the docket. Arraignment of appellant was set for February 1, 1978. On that date however the trial judge allowed attorneys Pitts and McDowell to withdraw and appointed J.L. Chestnut, Jr., appellant's present counsel, to defend him. Arraignment was then set for February 8. On that date appellant entered a plea of "not guilty," and trial was set for March 6. On February 9 the Chief Justice assigned Retired Circuit Judge Eris F. Paul of Elba to try the case.
As to the point (3) of Barker, supra, the defendant failed to assert his right to a speedy trial until the denial of such was alleged in a "Motion to Quash the Indictment" filed March 3, three days before his trial. Evidence was taken on that motion on March 6, and it was denied.
As to (4) we find no prejudice to the defendant in the delay. He was at all times serving time on another felony conviction. His freedom was not therefore unnecessarily impaired. As pointed out in the testimony on the motion to quash, it was to his benefit to let tempers in the county cool down before going to trial. The victim had served Wilcox County in the State Senate and as Judge of Probate. He was a well-known and respected public servant, and a speedy trial under those circumstances would certainly not have benefited the appellant. The untimely motion to quash on that ground was therefore properly denied.
 III
Appellant alleges that it was error to allow evidence of his oral confession to a police officer because he was intoxicated at the time and had been arrested less than two hours earlier for driving while intoxicated.
The rule is that intoxication amounting to mania or such impairment of the will and mind as to make the accused unconscious of the meaning of his words renders his confession inadmissible. However, proof of a lesser degree of intoxication will not render the confession inadmissible. Balentine v.State, Ala.Cr.App., 339 So.2d 1063, cert. denied, Ala.,339 So.2d 1070 *Page 1169 
(1976); Medders v. State, Ala.Cr.App., 342 So.2d 49 (1977);Scott v. State, Ala.Cr.App., 333 So.2d 619 (1976).
At trial the appellant challenged three statements on the intoxication issue. One was noninculpatory in nature, but proved to be false. It was made to Officer McGrew at the time of the appellant's arrest stating that the victim was at the Selma mall waiting for the appellant to pick him up. There, the intoxication issue was raised by the appellant after the statement had already been admitted into evidence. The second statement was made to Officer Dufour, set out in the facts herein and tended to prove motive. Both officers were subjected to full cross-examination or voir dire examination by counsel for the appellant.
Officer McGrew was questioned by the court and by both counsel. He maintained that the appellant was driving under the influence of alcohol, but was not "drunk." The witness testified that the appellant walked all right, replied to questions, appeared to know where he was and what was being asked him, and made intelligent replies. However, the appellant's statement about his "boss man" was a spontaneous and volunteered statement, not in response to any question propounded by Officer McGrew. Furthermore, a PEI test for blood alcohol administered to the appellant registered only 0.16 percent (0.10 percent by weight of alcohol in the blood being the minimum reading to support a charge of driving while intoxicated, § 32-5-193 (a)(3), Code of Ala. 1975).
Officer Dufour observed the appellant at the scene of the arrest and at the police station. He testified that the appellant's speech was not slurred, that he appeared to know where he was and what was happening around him, and that he answered his routine questions intelligently.
Captain James Foster testified as to the voluntariness of the appellant's inculpatory statement to him and as to a properMiranda warning given the appellant. On cross-examination counsel elicited that Foster smelled the odor of alcohol on the appellant, but did not notice "any slurring in his speech." The defense then called the appellant as a witness, in camera, to refute Captain Foster's testimony. The appellant stated that he remembered being arrested. He remembered the date and the time. He likewise remembered being taken to jail and being locked up. He remembered someone coming to his cell and taking him to a room in the building. He remembered staggering, but from then on he remembered nothing. He did not remember his rights being read, questions being asked, nor signing anything.
Before Captain Foster related the appellant's statement to the jury, he was again taken on cross-examination by the defense, and he stated that the appellant was not drunk at the time of questioning. The appellant was again called in rebuttal in the presence of the jury and related the same testimony asin camera. Foster then took the witness stand again and, over objection of the appellant, related the confession to the jury.
Each of the three officers testified as to a proper voluntariness and Miranda predicate which, if believed by the trial judge, would require a ruling that the statements were admissible.
Whether a confession is voluntary is a question to be determined by the trial judge. Harris v. State, 280 Ala. 468,195 So.2d 521 (1967). The trial judge need only to be convinced from a preponderance of the evidence to find a confession to have been voluntarily made. Lego v. Twomey, 404 U.S. 477,92 S.Ct. 619, 30 L.Ed.2d 618 (1972); Baldwin v. State, Ala.Cr.App., 372 So.2d 26, affirmed, Ala., 372 So.2d 32 (1978).
The evidence presented by the three officers was sufficient therefore to support the ruling that the appellant was not intoxicated to the degree that his statement would be considered, in the legal sense, as being involuntary.
 IV
Appellant contends that it was error to admit into evidence a tape recording of a confession he made on May 5, 1977, to Investigators C.H. Webber and E.V. Hedley. *Page 1170 
The appellant's confession on that occasion was tape-recorded and was later transcribed into a typewritten statement which he signed. Certain words were unintelligible to the secretary typing the transcript and were indicated therein by parentheses. No deletions occurred in the portion of the statement where the appellant gave the details of how the actual killing occurred. Most deletions occurred in portions dealing with routine work or activities during the day of April 30, 1977. However, the defense counsel objected to the deletions and specifically contended that such typewritten transcript from the tape recording was not the best evidence. He contended that the tape recording itself was the best evidence. The trial judge ruled the typewritten transcript to be inadmissible.
After playing the tape-recorded confession outside the presence of the jury, the trial court held it to be admissible. We note that both Webber and Hedley testified as to proper voluntariness and Miranda predicates prior to the trial court's ruling. We likewise note that the court reporter transcribed the entire statement from the tape recording without deletion during the trial.
Tape recordings are not per se inadmissible because some parts are inaudible. They became inadmissible only where the unintelligible portions are so substantial as to render the recording untrustworthy as a whole. United States v.Greenfield, 574 F.2d 305 (5th Cir. 1978). The admission of tape recordings into evidence is within the sound discretion of the trial judge. Here, the tape recording was authenticated by both officers. The trial judge listened to it outside the presence of the jury with both counsel present. They had a right to question portions of the tape, to make objections, or to explain away any ambiguities. We find the recording to be admissible for whatever weight the jury might accord it.Hammond v. State, Ala.Cr.App., 354 So.2d 280 (1977), cert. denied, Ala., 354 So.2d 294 (1978). Additionally, we have listened to the recorded confession and find it to be audible and understandable.
 V
For the first time, in his reply brief, counsel for the appellant challenges the sufficiency of the evidence going to prove that the intentional killing occurred during the course of a robbery. Counsel contends that the appellant, in his confession, admitted killing the victim in anger because the victim verbally abused him. Counsel contends that it was after the killing that the appellant thought of taking the billfold and the vehicle and fleeing.
In the appellant's earlier statement to Officer Dufour, he stated that he had been thinking of escaping for some time, and the occasion of working in the garden and going for fertilizer appeared to be the right opportunity. The jury had a right to weigh the appellant's version against all the circumstances presented by the evidence. A jury is not bound by the testimony of the only eyewitness, otherwise it would be impossible to obtain a conviction where an accused is the only witness to a crime. Circumstantial evidence will support a conviction as strongly as direct evidence provided it points to the guilt of the accused. Kelsoe v. State, Ala.Cr.App., 356 So.2d 735
(1978).
The jury could have reasonably inferred from the circumstances of the case that the appellant decided to rob and kill the victim and to use his vehicle and money to escape. They could consider the fact that the body was found with hands tied behind it, hidden by leaves and limbs, bludgeoned to death, the victim's empty wallet and credit cards discarded and the appellant in possession of a large amount of money and the victim's vehicle in another county. These facts support the inference that the appellant robbed and killed the victim with the intention of escaping confinement and with the further intention of going on to Birmingham and flying out of the state. The appellant's statement to Officer Dufour as to his prior intentions to escape would reinforce the jury's conclusion that this was not merely a killing in the heat of *Page 1171 
anger followed by a larceny of the wallet and vehicle as a mere afterthought. A jury question was presented by the evidence, and we cannot say their conclusion was palpably unjust or wrong.
 VI
On March 10, 1978, the jury rendered its verdict and was dismissed. On March 15 the appellant's counsel learned through an anonymous telephone call that one juror, Sadie Lee Moore, was not a resident of Wilcox County and had not been for approximately seven years. On March 24 the appellant filed a motion for a new trial setting out five grounds. The first ground alluded to the nonresident juror. That motion was not brought to the attention of the trial judge until the start of the aggravation and mitigation hearing on March 27 at which time counsel attempted to go into the motion rather than the subject scheduled for the hearing. The trial judge reset the date for the aggravation and mitigation hearing and allowed defense counsel to proceed with a hearing on the motion.
After some discussion with the court, the defense counsel moved to strike all grounds in his motion for a new trial except the first ground relating to the nonresident juror. He then restyled his pleading as a "Motion for a Mistrial."
The court records and the evidence adduced at the hearing on the appellant's motion indicated that the prospective jurors were examined in groups of twelve. Each group, including that in which juror Moore was questioned, was asked by the court: "Are you a resident householder or free-holder of Wilcox County, Alabama, and have you been such for the last preceding year?" The juror made no response to that question.
The evidence taken at the hearing indicated that juror Moore at one time resided in Wilcox County, but moved in late 1970 or early 1971 to Dallas County. She last voted and bought her last automobile tag in Wilcox County. She owned land in Wilcox County, sent her child to school there, and received her mail there. However, she testified that she considered herself a resident of Dallas County. Mrs. Moore stated that she did not recall the trial court's question concerning residency and if it was asked, she did not understand it. Furthermore, she stated that at the time of the trial she was not concerned with her residency for that was her first time to be summoned to serve, and she was not told that she had to be a resident of Wilcox County at that time.
It appears that as Mrs. Moore was a registered voter in Wilcox County and the jury lists were prepared from lists of registered voters pursuant to a federal court order, it naturally appeared that she was a resident of that county. A Wilcox County mailing address would fortify such a conclusion in the absence of evidence to the contrary. Therefore, until the matter was brought to the attention of defense counsel after the trial, no one suspected that Mrs. Moore was a current resident of the adjoining county.
The trial court denied the appellant's motion finding in pertinent part, the following:
(1) Juror Moore had twice been questioned (once with the venire en banc and once in a group of twelve) by the court concerning her residence in Wilcox County without her responding. Her failure to respond was not deliberate, nor intentional, but was probably from a lack of understanding concerning the meaning of "resident householder or freeholder."
(2) The juror was a resident of Dallas County at the time of the trial and claimed a homestead exemption there.
(3) She last voted and bought her automobile license tag in Wilcox.
(4) At the time of the trial, the juror presently owned land, received her mail, and sent her child to school in Wilcox County.
(5) There was no evidence that the district attorney nor any of his assistants had any knowledge that the juror was a resident of another county. *Page 1172 
(6) There was no evidence that the appellant nor his counsel had any knowledge of the juror's disqualification until several days after the trial had ended.
(7) There was no evidence that the juror was interested in the outcome of the trial, or was "anything other than a fair-minded citizen."
(8) There was no evidence that the defendant was prejudiced in any way by juror Moore serving on the jury.
The instant issue is whether the judgment of the trial court should be reversed and a new trial ordered for the sole reason that one of the jurors who sat on the case was not a resident of Wilcox County. This is not a case in which the appellant gambled upon the verdict only to later attack it upon a ground which is normally raised before the reception of the evidence.Brown v. State, 52 Ala. 345 (1875); Ball v. State, 252 Ala. 686, 42 So.2d 626 (1949). There is no contention that the appellant or his counsel had prior knowledge of the juror's residence in Dallas County, neither was there a lack of diligence on their part in not discovering that fact prior to the end of the trial. McHenry v. State, 279 Ala. 30,181 So.2d 98 (1965); Taylor v. State, 222 Ala. 140, 131 So. 236 (1930);Little v. State, Ala.Cr.App., 339 So.2d 1071, cert. denied, Ala., 339 So.2d 1073 (1976).
Under the code sections in force at the time of the commission of the offense, the nonresidence of a juror would be a disqualification. See: Title 30, §§ 6, 52, 55, 64, Code of Ala. 1940, Recompiled 1958; Maund v. State, 254 Ala. 452,48 So.2d 553 (1950). We note that under Title 30, § 20, Code of Ala. 1940, Recompiled 1958, Supp. 1973, in composing the jury roll from which the jury box is filled, it is incumbent upon the jury commission to select "the name of every citizen living in the county who possesses the qualifications herein prescribed," with one such qualification being that the person must be a resident of the county in which he is subpoenaed to serve. See also: Title 30, § 21.
Although a defendant has a right to have questions answered truthfully by prospective jurors, the failure of a juror to make a proper response to a question regarding his qualifications does not automatically entitle a defendant to a new trial. The proper inquiry by this court in such cases is whether the appellant's rights were prejudiced by the juror's failure to respond properly. Beauregard v. State, Ala.Cr.App.,372 So.2d 37 (1979), cert. denied, Ala., 372 So.2d 44, and cases cited therein. In Freeman v. Hall, 286 Ala. 161,238 So.2d 330 (1970), our supreme court stated:
 "We hold that the proper inquiry for the trial court on motion for new trial, grounded on allegedly improper responses or lack of responses by prospective jurors on voir dire, is whether this has resulted in probable prejudice to the movant. This appears to be the general rule throughout the country [see Annotations, 38 A.L.R.2d 624, and 63 A.L.R.2d 1061]. . . ."
The supreme court in that case likewise held that the trial court's application of the probable prejudice test is subject to review only for abuse of discretion.
Had the juror made a truthful answer to the court's question on voir dire, she would have been subject to challenge for cause. However, the mere fact that she resided in an adjoining county does not per se require a reversal of this cause. Nonresidency in such a case does not impute prejudice per se. In fact there are times when nonresident jurors would be less likely to bear prejudice or bias against a defendant. A notorious case where feelings are high and tempers hot within a community is a prime example. A case where a well-known and highly regarded public official of the county is brutally murdered by a convict would lead one to think that residents of the county would be more likely to bear ill will toward the accused than would the resident of another county. The most glaring analogy is in the case of a change of venue. Although the appellant did not request a change of venue in the instant case, our statutes nevertheless allow for such a procedure. Section 15-2-20, et seq., Code *Page 1173 
of Ala. 1975. In those cases where change of venue has been granted, an accused would be tried by a jury composed entirely of persons who were not residents of the county from which the case was transferred. Therefore, there is no inherent prejudice attributed to a trial by a nonresident or nonresidents of the county in which the offense was committed.
A full hearing was held on the issue of the nonresident juror, both sides had an opportunity to put on evidence, and the trial judge wrote an extensive order overruling that motion. We are unable to say that the trial judge abused his discretion or that prejudice to the appellant was shown by the evidence presented at that hearing.
 VII
Pursuant to § 13-11-3, et seq., Code of Ala. 1975, the trial court held a hearing on aggravating and mitigating circumstances on May 11, 1978. On May 19 the trial court issued its written finding of facts and sentenced the appellant to death. The trial court's finding of aggravating and mitigating circumstances set out in that order are as follows:
 "1. That the defendant, Charles Lee Bufford, did intentionally kill William Roland Cooper in the perpetration of a robbery, or attempt thereof, of the said William Roland Cooper.
 "2. That the intentional death of William Roland Cooper was especially heinous, atrocious and cruel as these terms are understood by ordinary men and by this court, in that the defendant struck said victim at least 2 blows on the back of the head with a metal bar (a garden tiller guide) which was about 17 inches long, almost 2 inches wide, and between 1/4 inch and 1/2 inch thick, resulting in massive fracture to the skull and brain hemmorage. He then tied the hands of the victim behind him, covered his body with leaves and left him to die.
 "3. That the defendant, Charles Lee Bufford, committed the capital felony with which he is charged for pecuniary gain.
 "4. That the defendant, Charles Lee Bufford, was 23 years of age at the time of commission of the capital felony and was at the time serving a sentence of two years on a felony charge of grand larceny for which he had been convicted. The defendant was being held in Wilcox County Jail in custody of the Sheriff awaiting transfer to prison. He was released from the jail as a trusty on the day in question, to do some work for the victim, William Roland Cooper.
 "5. In addition to the offense of grand larceny for which the defendant had been convicted, and was serving his sentence at the time of the offense, he had been convicted of assault and battery and abusive language, for which he served time.
 "The court finds no evidence of mitigating circumstances unless his age of 23 years should be so considered. The age of Charles Lee Bufford is insufficient to outweigh the aggravating circumstances of his pitiless acts enumerated herein.
 "Upon consideration of all the evidence, it is the opinion of the court that the death penalty fixed by the jury should be imposed."
We find the aggravating circumstances enumerated in 1, 3 and 5, supra, to be improper in the instant case.
As to aggravating circumstance number 1, the appellant was found guilty of "robbery or attempt thereof when the victim is intentionally killed by the defendant;" therefore, the primary element of the instant charge, robbery, cannot be used to aggravate the same charge. The charge consisted of two elements (1) the robbery and (2) the intentional killing. After conviction § 13-11-3 requires the trial court to hold a hearing to determine the existence vel non of aggravating and mitigating circumstances. Since the crime of which the appellant already stands convicted is capital robbery, a hearing to determine whether it was committed while the appellant was engaged in a robbery is a useless and redundant procedure. A second evidentiary hearing to prove the key element already proved in the case in chief makes no sense legally or logically. *Page 1174 
The rationale expressed in Cook v. State, Ala.,369 So.2d 1251 (1979), applies in the instant case. Robbery cannot be aggravated by robbery or else the appellant is punished twice for the same act. This court has so held in at least one case.Keller v. State, Ala.Cr.App., 380 So.2d 926 (1979). This issue has not been conclusively decided by our supreme court however. See: Thomas v. State, Ala.Cr.App., 373 So.2d 1149, and special concurrence thereto at 1160 (1979), and the supreme court opinion affirming that decision, but ignoring the instant issue (Ala., 373 So.2d 1167). In no case so far has the supreme court been faced with an instance where the only aggravating circumstance listed by a trial court was that of robbery aggravating robbery.
Colley v. State, Ala.Cr.App. [Ms. January 22, 1980] presented that issue to this court when the trial court, in answer to our remand, found robbery as the only aggravating circumstance in that capital robbery case. A majority of this court held that circumstance to be adequate aggravation, but on rehearing we resolved that conflict by adhering to our prior position inKeller, supra, and again remanded the case to the trial court for resentencing [Ms. February 26, 1980]. Until the Alabama Supreme Court rules conclusively on the instant question, this court has resolved the issue in favor of our prior holding inKeller, supra.
Aggravating circumstance number two is a valid finding by the trial court. We find no error on the part of the trial court in finding that the crime was especially heinous, atrocious, and cruel. The appellant intentionally struck a vicious blow to the head of the unsuspecting victim. When the victim was on the ground moaning, the appellant continued bludgeoning him then dragged him to a secluded place, tied his hands behind him, concealed his body, and left him either for dead or to bleed to death. See: State v. Dixon, Fla., 283 So.2d 1 (1973); Baldwinv. State, Ala.Cr.App., 372 So.2d 26 (1978), affirmed, Ala.,372 So.2d 32 (1979); Coon v. State, Ala.Cr.App., 380 So.2d 980
(1979).
Aggravating circumstance number three listed by the trial court is improper. Pecuniary gain may not be used as an aggravating circumstance in a case of capital robbery. Cook v.State, Ala., 369 So.2d 1251 (1979).
Aggravating circumstance number 4 was proper. That the capital felony was committed by a person under sentence of imprisonment may be considered pursuant to § 13-11-6 (1).
Aggravating circumstance number 5 is improper. That the appellant had prior convictions for assault and battery and abusive language are not convictions listed as aggravating circumstances in the capital felony statute. While the assault and battery charge did involve violence to the person, it was not a felony as required by § 13-11-6 (2). The abusive language charge was neither a felony nor an offense involving violence to the person pursuant to that section of the statute.
As to the only possible mitigating circumstance considered, we find no error in the trial court's finding that the age of the appellant (23) was insufficient to outweigh the aggravating circumstances enumerated. See: Baldwin, supra.
There has been some confusion as to whether a remandment and a new sentencing hearing is required where a trial court finds one or more proper aggravating circumstances, but likewise bases its sentence on one or more improper aggravating circumstances. Compare Mack v. State, Ala.Cr.App.,375 So.2d 476 (1978), affirmed, Ala., 375 So.2d 504 (1979), with Johnsonv. State, Ala.Cr.App. [Ms. May 22, 1979], reversed, Ala. [Ms. December 7, 1979]. Johnson is the latest expression of the supreme court on this issue. In that case there were at least two aggravating circumstances which were valid and one which was found to be invalid by that court. A remandment to the circuit court for a new sentencing hearing was mandated by that decision. *Page 1175 
The conviction of the appellant is hereby affirmed, but the cause is remanded to the trial court with directions to conduct a rehearing for the purpose of sentencing in accord with this opinion and cases cited herein.
AFFIRMED; REMANDED WITH DIRECTIONS.
All the Judges concur.