Appellant, Anthony Keith Johnson, was indicted by the June 1984 term of the Morgan County Grand Jury for the intentional murder of Kenneth Cantrell, during the course of a robbery, in violation of § 13A-5-40, Code 1975. The indictment charged specifically that "Anthony Keith Johnson . . . did intentionally cause the death of Kenneth Cantrell by shooting him with a pistol" and that he "caused said death during . . . the course of attempting to commit a theft of property of Kenneth Cantrell . . . by the use of force against the person of Kenneth Cantrell with intent to overcome his physical resistance or physical power of resistance. . . ." Appellant was subsequently tried and found guilty as charged in the indictment. A sentencing hearing was held, at which the jury recommended that appellant be sentenced to life imprisonment without parole. The trial court overrode the jury's recommendation and, on November 8, 1985, sentenced appellant to death.
The record reveals that on the evening of March 11, 1984, the victim, Kenneth Cantrell, and his wife, Nell Cantrell, were at their home in Hartselle, Alabama. The Cantrells had been in the jewelry business for 24 years and at this time were conducting the business from their home.
Mrs. Cantrell received a phone call from a person identifying himself as Bill Spears from Florence, Alabama, and he asked to speak to Mr. Cantrell. He told Mr. Cantrell that he would like to purchase some jewelry from him, and they arranged a meeting a short time thereafter at the Cantrell home. Mr. Cantrell was apparently suspicious of the caller, because he asked his wife to hide his wallet and bring him his .38 caliber pistol.
When Mrs. Cantrell heard a knock at the door, which led from their carport into the combined living room and dining room area of their home, she went to answer it. She observed that the man already had the storm door open, but she had to open the door to hear what he had to say. When she opened the door she encountered a man between 45 and 50 years of age who identified himself as Bill Spears. She noticed that he held one hand behind his back and she asked if he was concealing something. *Page 1008 
He said that he was not and showed her his hand.
At the same time he motioned for another man who had been hiding in the carport to come forward. At this, the man already at the door grabbed Mrs. Cantrell, and the other man, wearing a blue bandana over his face and brandishing a "real shiney" gun in his hand, announced "This is a hold-up."
Mrs. Cantrell, attempting to warn her husband, was able to break free from the first man who was holding her, run to her husband and fall at his feet. As she lay at her husband's feet she heard one of the men say, "Come on in, Bubba, I have got him," whereupon Mr. Cantrell said, "Freeze. . . . No we have got you" and one of the men said, "No, we have got you." During this verbal exchange one of the men fired at Mr. Cantrell; he returned fire and a short gun battle ensued. Mrs. Cantrell lay motionless at her husband's feet while this exchange occurred, only raising her head up enough to notice that one man had on brown boots. After a number of shots were exchanged, there was a silence, and then Mr. Cantrell fired one last shot. When this shot was fired she heard one of the intruders say, "Oh", and then she heard the sound of shuffling feet, as if one of the intruders was assisting the other in getting out the door.
Mrs. Cantrell waited a moment after the intruders left, looked up at her husband, noticed that he had blood all over him and that she had blood all over her but that she was not shot. She then called an ambulance and police to the scene.
Mr. Cantrell sustained six gunshot wounds in the exchange, three in the right side of his chest, one in the left side of his chest, one on the back of his right arm, and one to his right middle finger. The bullets which struck him in the chest passed through his lungs and the large arteries from the heart, causing rapid death.
On the evening of March 12, 1984, the day after the murder, appellant went to the home of David Lindsey, who was a friend, in Newell, Alabama. Appellant told Lindsey that he had been shot. When Lindsey inquired as to what had happened, appellant stated, "Well you know how it is when you have got the habit." Appellant told Lindsey that he knew he had been to Vietnam and asked if he knew a medic or someone who could get the bullet out. Lindsey told him that he knew no one who could do that.
At appellant's request, Lindsey, on the morning of March 13, 1984, drove him to a motel in Oxford to meet Gene Loyd. Lindsey testified that Loyd and appellant were glad to see each other, and Loyd asked appellant where he had been. Appellant replied that he "had to get the hell out of Hartselle." He said that he and some friends had gone into a place to get some gold and that he had been shot. According to Lindsey, appellant stated, "I got shot, but I got off a couple of rounds, and I believe I got that son of a bitch." Lindsey returned home, where he heard that a murder had occurred in Hartselle, and he contacted authorities.
Appellant was arrested on March 14, 1984, at the motel where he had been taken by Lindsey. A pair of brown boots, which appellant claimed to own, were found at the scene of the arrest. A bullet wound was discovered in his back; that wound was 50.5 inches from the ground when appellant was standing. A search warrant was obtained, and the bullet was removed from his back.
It was discovered that Mr. Cantrell had fired his R.G. brand revolver six times at the intruders. Most of the shots were in an upward direction from the point where he was sitting on his couch. The revolver was loaded with .38 special C.C.I. Blazer cartridges manufactured by Omark Industries. Four C.C.I. Blazer bullets were recovered from objects which they had struck at the scene. One bullet apparently passed through the ceiling and could not be found. One bullet passed through a pane of glass on the back door 46.375 inches from the ground. A search of cardboard boxes and the wall in this bullet's path failed to reveal the bullet. The four C.C.I. Blazer bullets found at the scene had the same number of lands and grooves as the bullets test fired *Page 1009 
from Mr. Cantrell's R.G. revolver, but it was impossible to definitely make a determination that Mr. Cantrell's revolver actually fired the bullets.
The bullet which was removed from appellant's back was a .38 special C.C.I. Blazer. The bullet had the same number of lands and grooves as those test fired from Mr. Cantrell's R.G. revolver and those found at the scene, but again, it was impossible to make a definite determination that Mr. Cantrell's revolver actually fired the bullet.
The bullet which was removed from appellant's back had glass imbedded in its nose. Test comparisons of the glass removed from the bullet and that found in the pane on the back door, through which the unaccounted-for bullet had passed, revealed that all of their physical properties matched, with no measurable discrepancies. Based upon F.B.I. statistical information, it was determined that only 3.8 out of 100 samples could have the same physical properties, based upon the refractive index test alone, which was performed.
 I
Appellant contends that the trial court erred in permitting the State to challenge juror Carrell for cause over appellant's objection. Appellant argues that juror Carrell was not unalterably opposed to the death penalty and that she was able to follow the trial court's instruction as to the law. He contends that when the trial court permitted the challenge for cause of juror Carrell it effectively denied appellant a fair trial under the Sixth and Fourteenth Amendments of the United States Constitution.
The most pertinent questions posed to juror Carrell on this issue by District Attorney, Mike Moebes, defense attorney, Thomas Digiulian, and the trial court and the corresponding answers given by juror Carrell were as follows:
"MR. MOEBES: Well, let's say if you heard all of the evidence and the testimony and the witnesses and the Judge's charge on the law and your oath, if the evidence in this case proved to you beyond a reasonable doubt and to a moral certainty that the Defendant was guilty as charged, would you return a verdict of guilty?
"JUROR CARRELL: Well, I guess you would almost have to.
"MR. MOEBES: Well, if one of the punishments in this case for such an offense is that of death by electrocution —
"JUROR CARRELL: No, I couldn't do that.
"MR. MOEBES: You could not do it?
"JUROR CARRELL: No, I couldn't do that.
"MR. MOEBES: Under no circumstances would you consider the punishment of death by electrocution?
"JUROR CARRELL: No, sir. I couldn't do that.
"MR. MOEBES: Anyone else?
(NO RESPONSE)
"MR. MOEBES: Then I take it, Mrs. Carrell, that what you have said is that you would not be willing to consider the death penalty as provided by law in this case, is that what you are saying?
"JUROR CARRELL: Electrocution. I mean I just — I just cannot — I don't feel like it is my place to put somebody else's life in my hands. I mean I just — my belief is we are not — we are just — we are not suppose to take another human being's life in our hands.
"MR. MOEBES: Mrs. Carrell, I am not asking you to defend your position. I just want to know what your position is now. Be truthful with me and the Court and the lawyers over there.
"JUROR CARRELL: I couldn't do it.
"MR. MOEBES: That is what we want to know, is how you fell about the death penalty.
"JUROR CARRELL: I couldn't do it.
". . .
"MR. MOEBES: Then I take it, Mrs. Carrell, that you feel that you would never under any circumstances vote as a juror for a death penalty? *Page 1010 
"JUROR CARRELL: No, I wouldn't.
"MR. MOEBES: I take it that you would refuse to apply the death penalty no matter how strong the evidence and under all circumstances in any case?
"JUROR CARRELL: That is right. I just don't believe I could do it.
". . .
"MR. DIGIULIAN: . . . Now, I believe you testified in response to Mr. Moebes that you didn't think there would be any circumstances under which you could require someone to be put to death for the commission of a crime, is that correct?
"JUROR CARRELL: That is right.
"MR. DIGIULIAN: Now, is that based on your religious beliefs?
"JUROR CARRELL: I feel like there should be punishment, but I just don't feel like I could say by death, you know.
"MR. DIGIULIAN: Now, is that in this case alone or any?
"JUROR CARRELL: I just don't think — I wouldn't want to have it on my neck — on my heart and my hands that I did that to somebody.
". . .
"MR. DIGIULIAN: . . . As jurors you would be called on to do your civic duty in this case if you are chosen to hear the evidence and render a verdict in accordance with your oath and instructions from the Court and the evidence that you hear. Now if you were chosen as a juror in this case, would you be able as your civic duty to listen to the evidence and follow your oath as a juror, which would require you to consider the imposition of the death penalty in this case?
"JUROR CARRELL: You know, that is hard to answer. I am real nervous, too. I mean I have stated my feelings, you know, and I just don't know. I mean I would have to follow the oath. I know that. We need to — we have got to have laws, but still in my own heart I just can't find where I could say death by electrocution or, you know, just death, you know. It would really bother me.
"MR. DIGIULIAN: But then that is a serious thing to have to do, isn't it?
"JUROR CARRELL: That is right.
"MR. DIGIULIAN: It should bother everybody, shouldn't it?
"JUROR CARRELL: That is right.
"MR. DIGIULIAN: But you would follow your oath, would you not?
"JUROR CARRELL: Yes I would follow it.
"MR. DIGIULIAN: Following your oath and consider the death penalty in this case — you would follow your oath, would you not? Don't make me put words in your mouth. Answer from your heart.
"JUROR CARRELL: I guess that — now explain a little bit about following the oath. To me that means — see, lots of this is new to me. This is my first experience as a juror or to be in a courtroom or anything, and I am very nervous. I want to do the right thing, and I know there are others involved and that the other family is involved, too, in this, but still —
"MR. DIGIULIAN: Ma'am, you —
"JUROR CARRELL: I don't know. I — could I just say it would be hard for me to say until I am in that situation — really there in that area. When it is like this situation is with me, and as many people as we have to pick from with people feeling in their hearts like I do, why would we even have to do that. Why were we put in a position to make this choice.
". . .
"MR. DIGIULIAN: . . . In your oath as a juror it provides that you will well and truly try all issues which may be submitted to you and true verdicts render according to the evidence. That is your oath. I am not trying to put you on the spot. I want to know what you think.
"JUROR CARRELL: I would have to really — I mean my feelings would — I would have to follow my oath. I would have to do what I felt right, you know.
". . .
"MR. DIGIULIAN: In the event that you were called to be a juror in the trial of the murder of a child, and that is not the *Page 1011 
case here, but maybe it is a brutal murder and the child was maybe tortured, would you then consider the death penalty under those kind of circumstances?
"JUROR CARRELL: Well, can I answer like this? I know there has to be punishment, but there again it would be hard for me to say yes, death, you know. I just feel like we are not — I don't have that person's life in my hands to judge, and I know now being a juror we are to judge, but I guess that is the reason I said — I am a strong believer in my religion, you know, and I know that we are not supposed to take lives.
 "MR. DIGIULIAN: But you would follow your oath as a juror? "JUROR CARRELL: I would have to follow my oath.
"MR. DIGIULIAN: And you would discharge your duty even though it would be hard.
"JUROR CARRELL: It would be hard, but I would have to follow my oath.
". . .
"MR. MOEBES: If you were chosen as a juror in the trial of this case, would your views on capital punishment prevent or substantially impair the performance of your duties as a juror in accordance with your instructions and oath? That is either prevent or substantially impair.
"JUROR CARRELL: It would probably prevent.
"MR. MOEBES: In your opinion it would prevent it?
"JUROR CARRELL: Uh-huh.
". . .
"THE COURT: Mrs. Carrell, can you think of any case that you would impose the death penalty in? Just answer me, can you or can't you?
"JUROR CARRELL: No.
"THE COURT: Is your belief based on your religious convictions that you shouldn't kill another human being under any circumstances?
"JUROR CARRELL: That is right. It is based on that."
In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844,83 L.Ed.2d 841 (1985), the Supreme Court reaffirmed and again set forth the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment. The standard, as stated by the Court, is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." The Court went on to note that the juror's bias need not be proved with "unmistakable clarity," and in discussing its reasoning stated:
 "This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be more fully developed infra, this is why deference must be paid to the trial judge who sees and hears the juror."
Wainwright v. Witt, supra, 469 U.S. at 424-26,105 S.Ct. at 852-53.
From the record, as set forth above, it is apparent that juror Carrell vacillated in her answers regarding her ability to fulfill her oath. Her final response on the issue, when asked whether her views would either prevent or substantially impair the performance of her duties in accordance with the trial court's instructions and her oath, was that "It would probably prevent." In view of this statement and the cumulative effect of her other responses, we find that juror Carrell sufficiently indicated *Page 1012 
that her bias towards the death penalty would indeed prevent the performance of her duties as a juror in this case. Accordingly, we find that the trial court committed no error in permitting the State to challenge juror Carrell for cause.
 II
The appellant contends that the trial court erred when it refused to instruct the jury that they could not consider the theft (by the use of force) allegation in the capital murder indictment as an aggravating circumstance in the penalty phase of the trial. The appellant cites Keller v. State,380 So.2d 926 (Ala.Cr.App. 1979), cert. denied, 380 So.2d 938 (Ala. 1980), and Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.) cert.denied, 382 So.2d 1175 (Ala. 1980), in support of this argument. The trial court, in refusing this charge, correctly noted that this line of cases was overruled by Kyser v. State,399 So.2d 330 (Ala. 1981). See also Dobard v. State,435 So.2d 1338 (Ala.Cr.App. 1982), affirmed, 435 So.2d 1351 (Ala. 1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745,79 L.Ed.2d 203 (1984).
Furthermore, § 13A-5-50, Code of Alabama 1975, entitledConsideration of Aggravating Circumstances in SentenceDetermination, provides as follows:
 "The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of section 13A-5-40."
Pursuant to this code provision and the decisions inKyzer, supra, and Dobard, supra, we can find no basis for the appellant's contention that this charge should have been given. Accordingly, we find that the trial court committed no error in refusing the requested charge.
 III
Appellant contends that the trial court erred in refusing his motions for judgment of acquittal on the grounds that there was no proof that he was in Morgan County, where the murder was committed, and no proof that the gun which he possessed at the time he was arrested was used in the shooting.
Contrary to appellant's contention that there was no proof he was in Morgan County when the murder was committed, we find that considerable evidence was presented on this issue. According to the testimony of David Lindsey, appellant, by his own admission stated that he had been in Hartselle, that he was involved in a robbery, that he had been shot, and that he believed he had a shot the man who shot him. There was also considerable additional circumstantial evidence, as a ready set forth above, which placed appellant at the scene of the crime.
We note that the jury was fully informed that a pistol which was found in appellant's possession when he was arrested was not the murder weapon and that they apparently accorded this fact little weight. The jury apparently did not find it unusual that the appellant no longer had the murder weapon in his possession when he was arrested some three days after the murder was committed.
In Cumbo v. State, 368 So.2d 871 (Ala.Cr.App. 1978), cert.denied, 368 So.2d 877 (Ala. 1979), this court stated:
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." (Citations omitted.) *Page 1013 
See also Daniels v. State, [Ms. 1 Div. 92, Nov. 16, 1985] (Ala.Cr.App. 1985).
Viewing the State's evidence by this principle we find that the evidence was more than sufficient to allow the jury to reasonably conclude that the evidence excluded every reasonable hypothesis except that of guilt. Accordingly, we find that the trial court did not err in denying appellant's motion for judgment of acquittal.
 IV
Appellant, finally, contends that the trial court erred when it refused to strike information from a pre-sentence report indicating that marijuana was found at the scene where the defendant was arrested. When appellant requested that this information be stricken from the report, the trial court replied, "I won't strike it, but I won't consider it as being [an] aggravating circumstance." The sentencing order reveals that the trial court, in fact, did not consider this information in pronouncing sentence upon the appellant.
In a most relevant portion of Thompson v. State,503 So.2d 871 (Ala.Cr.App. 1986), this Court found as follows:
 "The appellant contends that the inclusion in the pre-sentence report's criminal history section of charges that had not resulted in convictions was reversible error. However, Rule 3(b)(2), Alabama Temporary Rules of Criminal Procedure, specifies that the pre-sentence report may contain the 'defendant's prior criminal and juvenile record, if any.' It is clear that the inclusion of charges that did not result in convictions is proper because the Rule allows for juvenile charges to be included. It is well settled that juvenile charges, even those that result in an adjudication of guilt, are not convictions and may not be used to enhance punishment. See Baldwin v. State, 456 So.2d 117, 125 (Ala.Crim.App. 1983), aff'd, 456 So.2d 129 (Ala. 1984) aff'd, [472] U.S. [372], 105 S.Ct. 2727, [86] L.Ed.2d [300] (1985). The inclusion of the charges in no way prejudiced the appellant. The trial judge did consider some of the charges listed, but only those which had resulted in convictions."
From the above, it is apparent that the mere presence of information in the presence report which should not be considered for the purpose of enhancing punishment is not,per se, prejudicial. In sentencing the appellant, the trial court in the instant case did not consider the portion of the report which indicated that marijuana was found at the scene. Consequently, we find that although this information was not stricken from the report as requested, it in no way prejudiced the appellant.
 V
As required by § 13A-5-53(a), Code of Alabama 1975, this court reviews the propriety of the imposition of the death penalty in this case. Our review must include a determination of the following questions:
 (1) Was any error adversely affecting the rights of the defendant made in the sentence proceedings?
 (2) Were the trial court's findings concerning the aggravating and mitigating circumstances supported by the evidence?
 (3) Was the death penalty the proper sentence in this case?
As to the first question, we have reviewed the sentence proceedings and have found no error adversely affecting the defendant's rights. As to the second question, we have reviewed the record and are satisfied that the trial court's written findings concerning the aggravating and mitigating circumstances are fully supported by the evidence.
To answer the third question, whether the death penalty was properly imposed in this case, we must determine:
 "(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
 "(2) Whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and *Page 1014 
 "(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
Code of Alabama 1975, § 13A-5-53(b); see also Beck v. State,396 So.2d 645 (Ala. 1980).
There is nothing in the record before us which even intimates that the death penalty was imposed under the influence of passion, prejudice, or any other arbitrary factor.
Our independent weighing of the aggravating and mitigating circumstances leaves us with no doubt that the death penalty was appropriate in this case. We find that there were two statutory aggravating circumstances in this case, as provided by § 13A-5-49(1) and (4), Code of Alabama 1975. Those were that appellant committed the offense while he was under a sentence of imprisonment and that the capital offense was committed during the course of a robbery. We further find that there were no statutory mitigating circumstances, as provided by §13A-5-51, Code of Alabama 1975. Finding none of the non-statutory mitigating circumstances raised by appellant to have merit, we determine that the aggravating circumstances clearly outweigh the mitigating circumstances and that the death penalty was appropriate in this case.
In regard to the final determination this court must make, we find that the death penalty imposed on the defendant is not excessive or disproportionate to the penalty imposed in similar cases. See, e.g., Hamilton v. State, 520 So.2d 155 (Ala.Cr.App. 1986); Thomas v. State, 460 So.2d 207 (Ala.Cr.App. 1983), affirmed, 460 So.2d 216 (Ala. 1984); Singleton v. State,465 So.2d 432 (Ala.Cr.App. 1983), affirmed, 465 So.2d 443 (Ala. 1985); Bush v. State, 431 So.2d 555 (Ala.Cr.App. 1982) affirmed, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865,104 S.Ct. 200, 78 L.Ed.2d 175 (1983); Jacobs v. State,361 So.2d 607 (Ala.Cr.App. 1977), affirmed, 361 So.2d 640 (Ala. 1978),cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83
(1979).
As required by Rule 45A, A.R.A.P., we have searched the record for any plain error or defect in the proceedings below, which may or may not have been brought to the attention of the trial court, which might adversely affect the substantial rights of the appellant. In doing so we discover that the appellant objected to the introduction of the bullet which was removed from his back.
The bullet was removed from appellant's back pursuant to a search warrant issued by the Circuit Court of Morgan County. Appellant, after the warrant was issued, petitioned this court for a writ of prohibition, which we denied in Ex parte Johnson,452 So.2d 888 (Ala.Cr.App. 1984). While the appellant did not raise it on appeal, we believe that we should address any effect of Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611,84 L.Ed.2d 662 (1985), upon our decision to allow the surgical removal of the bullet, as the direct consequence of that decision was the introduction of the bullet at trial.
In Winston, a shopkeeper was wounded during an attempted robbery, but, being armed himself, was apparently able to wound his assailant in the left side before he fled. Lee was found eight blocks from the scene suffering from a gunshot wound to his left chest.
The Commonwealth of Virginia moved in state court for an order directing Lee to undergo surgery to remove the bullet, asserting that the bullet would provide evidence of Lee's guilt or innocence. As a result of expert testimony, which indicated that the surgery would require an incision of only 1/2 inch, and would be performed under local anesthesia without incurring the dangers of general anesthesia, the trial court granted the motion to compel Lee to undergo surgery. The Virginia Supreme Court, thereafter, denied Lee's petition for a writ of prohibition. Lee then attempted to have the operation enjoined by bringing an action, based on Fourth Amendment grounds, in the United States District Court for the Eastern District of Virginia. That court refused to issue an injunction. *Page 1015 
Just prior to surgery, however, X-rays revealed that the bullet was, in fact, substantially deeper in Lee's chest than earlier believed, and the surgeon determined that general anesthesia would be needed. Lee moved for a rehearing, which was denied by the trial court, and that denial was affirmed by the Virginia Supreme Court. He then returned to the federal district court, which, after an evidentiary hearing, enjoined the surgery. The Court of Appeals for the Fourth Circuit affirmed, and the United States Supreme Court granted certiorari to consider whether a State could compel a suspect to undergo this type of surgery in a search for evidence of a crime.
The Supreme Court stated that "[t]he reasonableness of surgical intrusions beneath the skin depends on a case-by-case approach, in which the individual's interests in privacy and security are weighed against society's interests in conducting the procedure." The Supreme Court in discussing the risks associated with the surgical procedure noted that one surgeon had testified that due to the difficulty of discovering the exact location of the bullet, extensive probing and retracting of the muscle tissue could be required, which could lead to injury of the muscle, blood vessels, and nerves. The Court also noted medical testimony which indicated that the greater intrusion into the chest cavity and the larger incisions required would increase the risk of infection. The Court also addressed the fact that Lee would be required to undergo general anesthesia and found that "[t]his kind of surgery involves the total divestment of respondent's ordinary control over surgical probing beneath his skin."
In examining the other part of the balance, society's interest in conducting the procedure, the Court found that arguments of a compelling need for the bullet were not persuasive. The Court noted that the Commonwealth had available to it substantial additional evidence that Lee was the individual who accosted the shopkeeper on the night of the robbery. The Court went on to affirm the decision of the district court prohibiting the surgical removal of the bullet.
We believe that the instant case can be distinguished fromWinston. Here, there was competent medical testimony which established that the bullet was lodged in fatty tissue, just beneath the skin, in the area of the shoulder blade; that surgery would be minor and would be performed with local anesthetic; and that practically no danger to life or health would be presented by the surgery. Due to the almost non-existent risk of danger to appellant as a result of the surgery and the potential value of the bullet to the State's case, we find that the appellant's interest in privacy and security did not outweigh society's interest in conducting the procedure. Therefore, we reaffirm our decision in Ex parteJohnson, supra, which permitted the surgical removal of the bullet, and we find that the bullet was properly introduced into evidence at trial.
A further review of the record pursuant to Rule 45A, A.R.A.P., reveals no other issue which might adversely affect the rights of the defendant. We, therefore, find that the judgment of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.
ADDENDUM
STATE OF ALABAMA, PLAINTIFF
VS.
ANTHONY KEITH JOHNSON, DEFENDANT
NO. CC84-0331
IN THE CIRCUIT COURT OF MORGAN COUNTY, ALABAMA
DETERMINATION OF SENTENCE BY
COURT 13A-5-47, CODE OF ALABAMA 1975
The sentencing hearing in this case has been conducted, the jury has returned an advisory verdict and the Court now proceeds to determine the sentence. *Page 1016 
The Court has previously ordered a pre-sentence investigation report which has been filed containing the information prescribed by law for felony cases. The Court requested no specific additional information. None of the report was kept confidential and a hearing has been held in open court to afford both sides an opportunity to respond to the pre-sentence report and present any evidence about any portion of it that might be subject to factual dispute. This hearing has been recorded by the Reporter.
At the conclusion of the hearing the Court afforded each side an opportunity to present arguments concerning the existence of aggravating and mitigating circumstances. The order of the argument was the same as at the trial of a case.
The Court now proceeds to enter specific written findings concerning the existence or non-existence of each aggravating circumstance enumerated in Section 13A-5-49, Code of Alabama1975.
 Aggravating Circumstances
1. The Court finds beyond a reasonable doubt the aggravating circumstance defined in 13A-5-49(1) EXISTS in this case in that the capital offense was committed by a person under sentence of imprisonment.
2. The aggravating circumstance defined in Section13A-5-49(2) DOES NOT EXIST and no evidence in support of such an aggravating circumstance was offered.
3. The aggravating circumstance defined in Section13A-5-49(3) DOES NOT EXIST and no evidence in support of such an aggravating circumstance was offered.
4. The Court finds beyond a reasonable doubt that the aggravating circumstance defined in Section 13A-5-49(4) EXISTS in this case by reason that the capital offense was committed while the defendant was engaged in the commission of a robbery.
5. The aggravating circumstance defined in Section13A-5-49(5) DOES NOT EXIST and no evidence in support of such an aggravating circumstance was offered.
6. The aggravating circumstance defined in Section13A-5-49(6) DOES NOT EXIST and no evidence in support such an aggravating circumstance was offered.
7. The aggravating circumstance defined in Section13A-5-49(7) DOES NOT EXIST and no evidence in support of such an aggravating circumstance was offered.
8. The aggravating circumstance defined in Section13A-5-49(8) DOES NOT EXIST and no evidence in support of such an aggravating circumstance was offered.
 Mitigating Circumstances — Generally
1. The Court finds that the mitigating circumstance defined in 13A-5-51 DOES NOT EXIST in that the defendant does have a significant history of prior criminal activity.
2. The mitigating circumstance defined in 13A-5-51(2) DOES NOT EXIST in that the capital offense was not committed while the defendant was under the influence of extreme mental or emotional disturbance.
3. The mitigating circumstance defined in 13A-5-51(3) DOES NOT EXIST in that the victim was not a participant in the defendant's conduct and did not consent to it.
4. The mitigating circumstance defined in 13A-5-51(4) DOES NOT EXIST. The defendant was an accomplice in the capital offense committed, but the evidence does not clearly demonstrate that it was "committed by another person." Whether the defendant actually fired a fatal shot or not, his participation cannot be considered relatively minor. His participation was substantial and critical.
5. The mitigating circumstance defined in 13A-5-51(5) DOES NOT EXIST in that the record does not reflect that the defendant was under extreme duress or under the substantial domination of another person.
6. The mitigating circumstance defined in 13A-5-51(6) DOES NOT EXIST in that there is no substantial evidence before the Court that the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired. Defendant argues that he had a dope habit, but *Page 1017 
there is no evidence that he was under the influence of any drug which impaired his responsibility at the time of the murder. The evidence reflects that his actions before, during and after the crime were calculated and completely subject to his control.
7. The mitigating circumstance defined in 13A-5-51(7) DOES NOT EXIST in that the age of the defendant at the time the crime was committed was 27 years.
The Court has addressed all of the statutory mitigating circumstances although the defendant only argued those enumerated in (1), (4), (6) and (7) of Section 13A-5-51,Code of Alabama 1975.
 Consideration of Defendant's Character Record Section 13A-5-52, Code of Alabama 1975
In addition to the mitigating circumstances specified in Section 13A-5-51, the Court has considered all aspects of defendant's character of record and the circumstances of the offense which the defendant has offered as a basis for a sentence of life imprisonment without parole instead of death. The Court further invited the defendant to direct the Court's attention to any other relevant mitigating circumstances from any source. The Court finds that there are some statements in the pre-sentence report and some other aspects of the case that have certain mitigating aspects to them. These were considered.
 Consideration of the Jury's Verdict
The Court has independently weighed the jury's verdict, which was for life imprisonment without parole, and considers it an aspect of mitigation, separate and apart and in addition to the mitigating circumstances provided by Section 13A-5-51, Section13A-5-52.
 Weighing of Aggravating and Mitigating Circumstances Section 13A-5-48, Code of Alabama 1975
The Court now proceeds to weigh the aggravating and mitigating circumstances to determine the appropriate sentence under the law. The Court has not merely tallied for the purpose of numerical comparison the aggravating and mitigating circumstances, but has marshaled and considered in organized fashion, for the purpose of determining the proper sentence, all of the circumstances in this case whether aggravating or mitigating, including all relevant mitigating circumstances whether enumerated in the criminal code or not, including the jury's recommendation.
The Court finds the aggravating circumstances are substantial and controlling. The mitigating circumstances (other than the jury's recommendation) can be found only by a strained search and are deemed insubstantial by the Court in the face of the evidence which demonstrates a vicious killing of a man in what should have been the quiet repose and safety of his own home.
The Court sentences the defendant, after allocution, to death by electrocution on a date to be fixed by the Supreme Court of this State after disposition of the automatic appeals provided for by law. The Sheriff shall immediately transfer the defendant to the custody of the Director of Corrections and Institutions who shall execute the following judgment of the Court:
 JUDGMENT
On this date the defendant was brought before the Court for the purpose of imposing sentence. He was accompanied by his attorneys of record. As reflected by the previous orders and judgments of this Court, the defendant has been tried by a jury and found guilty of the capital offense charged in the indictment. He has been afforded a sentencing hearing at which the jury recommended the punishment at life imprisonment without parole by a vote of 9 to 3. Defendant has been afforded all other hearings provided by law, including the challenge of the pre-sentence report, and other hearings as are evidenced by written findings of fact of record in this case.
The defendant, Anthony Keith Johnson, being asked by the Court if he had anything to say why the judgment of the Court and sentence of the law should not be pronounced against him replied, NOTHING. *Page 1018 
It is now considered by the Court and it is its judgment, after weighing of all of the aggravating and mitigating circumstances, including the verdict of the jury, that the defendant is guilty as charged in the indictment of the offense of capital murder and the Court hereby fixes his punishment at death by electrocution.
It is, therefore,
ORDERED AND ADJUDGED that the Sheriff of Morgan County, Alabama immediately deliver the defendant, Anthony Keith Johnson, into the custody of the Director of the Department of Corrections and Institutions, there to be safely kept by said Director until a date is fixed by the Supreme Court of the State of Alabama for the execution of this judgment after an exhaustion of defendant's appeals.
On that date and at such time fixed by the Supreme Court of this State, the designated executioner shall, at the proper place for the execution of one sentenced to suffer death by electrocution, cause a current of electricity of sufficient intensity to cause death to pass through the body of the said Anthony Keith Johnson until he is dead.
The Court Reporter shall immediately prepare a transcript of all of the evidentiary proceedings held in this case and the Clerk shall prepare the record proper. The appellate process shall commence this date.
This the 8th day of November, 1985.
R.L. Hundley
R.L. Hundley, Circuit Judge