The appellant, James Charles Lawhorn, was indicted, by the May 1988 term of the Talladega County grand jury, for the capital offense of murder of William Clarence Berry pursuant to a contract for hire, with Altion Maxine Walker, consideration being $100. Ala. Code 1975, § 13A-5-40(a)(7). On April 26, 1989, after deliberating for 35 minutes, the jury returned a verdict of guilty as charged. A sentencing hearing was conducted, in accordance with §§ 13A-5-45 and -46, and the jury returned an advisory verdict, based on a vote of 11 to 1, recommending to the trial court that the penalty be death. On June 26, 1989, the trial court held a sentencing hearing, in compliance with §13A-5-47, and fixed appellant's punishment at death.
The prosecution presented the following evidence:
During the late morning of March 31, 1988, the attention of Officer Kenneth *Page 1161 
Brasher of the Sylacauga Police Department was drawn to some people arguing across the street from a Sylacauga gas station at which he had stopped. He observed a woman in a truck belonging to Altion Maxine Walker, appellant's aunt. He also saw the victim run from appellant and get in his automobile.
Later that day, a man driving an automobile, later identified as belonging to the victim, was seen following a truck driven by a woman and later identified as belonging to Walker. The vehicles stopped at a store on Highway 148, about one-half mile from Wiregrass Road. After the drivers bought sodas from a machine located outside the store, both got into the truck and drove away. The owner of the store saw the automobile parked in front of the store at 3:30 or 4:00 that afternoon, and it remained there until April 2, when it was towed away by police officers.
At approximately 4:00 p.m. on March 31, a man who was on a dirt road off of Highway 148, observed a truck, which resembled Walker's, turn down the road and come toward him. He observed three people sitting in the front seat of the cab, two of whom were "fairly young men" with beards. (Appellant had a beard at this time.)
On April 1, Walker cashed an $800 check drawn from the account "Maxine Walker, for Children of F.L. Walker" and payable to the First National Bank of Sylacauga. On that same date, she deposited $600 of those funds to her account and kept $200 in cash. (The above information was established by bank records.)
On April 2, at approximately noon, a hunter discovered the body of the victim, William Clarence Berry, in a wooded area about 70 feet off Wiregrass Road, about 2 miles from Sylacauga.
An autopsy was performed on the body of the 46-year-old victim on April 3. The autopsy revealed abrasions on the forehead and 27 gunshot wounds, 16 of which were entrance wounds and 11 of which were exit wounds. Gunshot from a pistol or a rifle caused four wounds: one entering the left side of the neck; one entering the chin, which went into the brain, causing death instantly; and two entering the left side of the chest, one of which severed the spine and spinal cord, also causing death instantly. The remaining wounds were caused by a shotgun. They were to both arms, the upper abdomen, the right side of the chest, the right leg, and the right upper back. The wounds from either weapon would have been fatal. The cause of death was "multiple gunshot and shotgun wounds."
On the night of April 2 and on April 3 and 4, officers seized, from Walker's residence, a 12-gauge shotgun, a 12-gauge .00 buck Winchester shell, and an empty box of .00 buckshot. A box of Winchester Super-X .25 caliber shells was retrieved by Robert Kilgore, Walker's son, from under a shed located approximately 50 feet behind the residence. Parts of a black box were found about five feet behind the residence, and papers for the operation of a Titan semi-automatic .25 caliber pistol were found between the house and the barn. A FIE Titan .25 caliber automatic pistol with a clip was found in the driveway behind the residence.
The 12-gauge shotgun was compared with three spent 12-gauge shotgun shells (two Winchester brand shells and one Activ brand shell) that had been found off the road near the scene. Although each shell had the same class characteristics, the firearms expert was unable to conclude, with absolute certainty, that the spent shells had been fired from that particular gun. However, he did determine that the three .25 auto-caliber spent projectiles recovered from Berry's body and a spent .25 caliber cartridge found at the scene had been fired by the pistol found in Walker's driveway. Shotgun pellets and pellet fragments recovered from the body, pellets removed from the ground near the body and toward the road, and one pellet removed from a tree five to ten feet from the body were all copper-plated .00 buckshot.
A fingerprint expert determined that a latent print lifted from the exterior of the passenger door of Walker's truck was that of appellant. She also determined that a latent print lifted from the box of Winchester *Page 1162 
shells found under Walker's shed was that of Walker.
Late in the evening of April 2, the day the body was discovered, appellant was advised of his rights guaranteed byMiranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694
(1966), by Investigator Frankie Wallis at the Sylacauga Police Department. Appellant acknowledged that he understood those rights and that he wished to talk. He also signed a waiver form.
On April 7 at approximately 4:00 p.m., appellant was again advised of his rights by Wallis, this time in the presence of Ann Wallace, of the district attorney's office, and Lieutenant Billy Joe Pope, and at the Talladega County jail. Appellant again acknowledged his understanding of his rights and his desire to talk to the officers. He also signed a waiver form and wrote on it, "I do not want a lawyer." No one threatened appellant, made him any promise, or rewarded him to induce a statement from him. Appellant first stated that his aunt had tried to hire him to kill Berry, but that he did not take any part in it and that he was in Alexander City until 5:00 p.m. on the day of the murder.
Appellant gave another statement at 5:40 p.m. wherein he related the following: From the Monday prior to the murder through the Friday after the murder, appellant stayed with his aunt, Walker. During the week, Walker told him that she was scared of Berry; that she had had her son, Kilgore, "beat his ass"; and that she wanted to "get rid" of him. Nearly everyday, she asked appellant to "get rid" of Berry. On Wednesday, she told him that she would pay him, and he said no. On Thursday, appellant and Walker, in Walker's truck, ran some errands in Alexander City. They picked up appellant's brother, Mac Lawhorn, about 1:30 p.m. On their way to Sylacauga, Walker asked Mac Lawhorn if he would be interested in making some money, and he answered, "Yes." He asked her what was the job, and she replied, "Get rid of William." Appellant further explained that Walker wanted to hire them for $100 to get rid of Berry. As they rode to Sylacauga, Mac Lawhorn was lying down in the back seat, at his aunt's direction.
In Sylacauga, they went to the Otasco hardware store where appellant retrieved a 12-gauge single-shot shotgun and four shells from the automobile of his cousin Kilgore, Walker's son. Then, between 4:00 p.m. and 5:00 p.m., the three went to a wooded area, where, according to Walker, she and the victim "go parking," and appellant and Mac Lawhorn got out of the truck to wait in the woods until Walker returned with Berry. Appellant had a pistol in his pocket that he had gotten out of Walker's truck, and Mac Lawhorn was carrying the shotgun, which he loaded.
In less than 30 minutes, Walker returned with Berry. Appellant and Mac Lawhorn were hiding in the woods. Berry and Walker got out of Walker's truck, and according to Walker's version that she later told appellant and his brother, Walker went across the road to the bushes to "use the bathroom." Berry went across the road with her, but he then began running up the road. (Walker later told them that he had been "real" scared "the whole time" that Kilgore was waiting on him.) Walker then went to the two men and told them that Berry had run up the road. Then, Walker got into the driver's seat of her truck, the two men lay down in the bed of the truck, and Walker told them that she would slam on the brakes when she caught up with Berry.
We now refer to appellant's actual words to explain the subsequent occurrences:
"Q . . . . And what happened after that?
 "A When she got to him, she slammed on brakes. My brother raised up, shot him in the shoulder. . . . He jumped — He hit the ground, then he jumped back up and he started running again. My brother shot him again.
". . . .
 "Q Was he running in the road or towards the woods?
"A He was running towards the woods.
 "Q Okay. When your brother shot him the first time, was W.C. [the victim] facing *Page 1163 
your brother or was his face away from your brother?
"A Facing.
 "Q Because ya'll had passed by W.C. when he leaned up he was smack face on with W.C.?
"A Yeah.
". . . .
"Q All right. And then what happened?
"A After he shot him?
"Q I believe you said he fell?
 "A Yeah. He hit — he hit the road. After he hit the road, he jumped up and he hollered. I remember him hollering, so my brother shot him again . . . and he was still running.
"Q Was he running off the road that time?
 "A When he shot the second time, he was running off the road, and he hit — he hit the ground. My brother shot at him again and missed. That's when he hit the dirt in front of him, hit the dirt.
". . . .
"Q W.C. was on the ground then?
 "A On the ground. . . . I then walked over and I heard him making noises, so I pulled the pistol out of my back pocket and shot him.
". . . .
"Q Okay. How many times did you shoot him?
"A Approximately three times.
 "Q Okay. And you said he was still making noises when you walked down there where he was at?
 "A It just, you know, like gurgling noises. . . . But he was already dead.
 "Q . . . . And how far from the truck did you have to go down there where he was at?
"A About 15, 20 feet.
"Q What area of the body did you shoot?
 "Q I don't — I don't really know. I just — it was quick. It was real quick, because I got, you know — We was — My aunt was scared of somebody seeing her truck, so she told us to hurry up. She didn't want her truck seen.
". . . .
 "Q Did you and Mac say anything to each other after he shot him with the shotgun the first time?
 "A He told me this, to make sure he was dead. I left from the truck, went to where he was laying on the ground and I could see his leg was tangled in a vine or something. That's what made him fall.
". . . .
"Q Did Mac tell you you'd have to finish anything?
 "A He told me to finish, go make sure he was dead. That's all he said. . . . We got — And after that, we got in the truck. She took — . . . . I sat back down in the truck, took the pistol back out of my back pocket, which would have been on the left side of my pocket, throwed it down on what would have been a console which is in the center of her truck. Then she put the pistol back into a gray box, a little small gray box, put it in a sack with all the shells, and they took — we went back to town. I got out of the truck at a red light and walked straight — I went — I walked from that red light to a corner which would have been the main road, stopped, looked up. The light was red. I crossed the street, went straight over there where my cousin [Kilgore] was working [at Otasco's]."
Appellant then continued as follows: After Kilgore got off work at 5:30 p.m., he and appellant went back to the murder scene to look for the shotgun and pistol shells because appellant did not want to leave any evidence. However, he could not find any. Then they went to Walker's house. There, Kilgore told his mother to clean the shotgun. He also told her to get the pistol because, since she had a permit to carry it, it "would show instant guilt." However, Walker had already given the pistol to Mac Lawhorn to get rid of. So, appellant called his brother around 6:30 p.m. and told him to get the pistol. (Telephone records verify that a telephone call was made at 6:40 p.m. on March 31 from Walker's residence to appellant's mother's residence.) Mac Lawhorn told him that he, their mother, and their sister were going to *Page 1164 
eat and that they would be back later. Walker and appellant went to the Lawhorns' mother's house to get the pistol from Mac Lawhorn. While Walker sat in her truck, appellant got the pistol. Mac Lawhorn told Walker to bring him his money the following morning, and Walker replied, "I'll go to the bank in the morning and get the money."
Appellant and Walker then left and returned to her house between 7:30 p.m. and 8:00 p.m. There, Kilgore took the pistol, put it in the trunk of his automobile, and said that he would do something with it.
Friday morning, Walker and appellant left her residence and "went straight to the bank" where Walker gave him $50 and told him it was payment for "getting rid" of Berry.[1]
 I
Appellant first contends that the trial court erred in denying his motion for change of venue due to pretrial publicity. In its written order denying the motion, the trial court stated that it had considered the defense exhibits consisting of 16 local newspaper articles, dating from May 4, 1988, to November 17, 1988, with thirteen undated; the testimony of the local radio station manager; and the voir dire examination of the potential jurors. The manager testified that, in 1988, the station's average one-quarter hour audience was 8,000; that, in his opinion, 10 of the 16 newspaper articles had been reported on the radio's 7:00 a.m. newscasts; and that he did not know what portions of the articles had been reported. Based upon the court's review of the voir dire examination of the venire, the trial court found that, of the 54 qualified venirepersons, 24 indicated that "they had heard or read something in the past about the case." (Three of these 24 were challenged by the prosecution for their convictions against capital punishment.) The voir dire examination revealed only one venireperson who answered affirmatively the question of whether there was anyone who could not totally disregard any knowledge of the crime and render a fair and impartial verdict based upon the evidence, the exhibits, and the trial court's oral charge. After this venireperson was further examined outside the presence of the venire, the trial court accepted the challenge for cause of this venireperson. A substantial majority of the other venirepersons who had heard of the case indicated that they did not remember any details of the newspaper articles and that they had not discussed the case with anyone. Defense counsel's voir dire examination of the venire was not curtailed in any manner, and none of his challenges were overruled.
The principles utilized in our review of the trial court's ruling are set forth in Ex parte Grayson, 479 So.2d 76, 80
(Ala), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1985), as follows:
 "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124
[103 S.Ct. 3097, 77 L.Ed.2d 1355] . . . (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333 [86 S.Ct. 1507, 16 L.Ed.2d 600] . . . (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim.App. 1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298
(Ala.Crim.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723
[81 S.Ct. 1639, 1643, 6 L.Ed.2d 751] . . . (1961):
 " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without *Page 1165 
more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .'
 "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800 [95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589] . . . (1975). Thus, '[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978)."
The trial court did not abuse its discretion in its denial of appellant's motion, for appellant failed to establish that there existed "actual prejudice" against him or that "the community was saturated with prejudicial publicity." The record offers no indication, at all, that any juror had a fixed opinion or that the verdict was not impartially rendered on the evidence presented. See also Henderson v. State, 583 So.2d 276
(Ala.Cr.App. 1990) (Part I); Kuenzel v. State, 577 So.2d 474,483 (Ala.Cr.App. 1990) (Part III).
 II
Appellant contends that the trial court erred in failing to ask the venire whether any venireperson so favored the death penalty that he or she would never vote for life imprisonment without the possibility of parole. This issue is reviewed under the "plain error" standard, for defense counsel did not request that the trial court examine the venire on this matter. We further note that, although the trial court permitted the attorneys to personally conduct most of the voir dire examination, defense counsel asked no question related to the subject.[2]
This court has recently addressed this exact issue in a very similar factual setting, as follows:
 "A prospective juror may not be excluded from a capital case for personal opposition to the death penalty unless the juror's beliefs would ' "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' Wainwright v. Witt, 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841] . . . (1985) (footnote omitted). On the other hand, '[a] venire member who believes that the death penalty should automatically be imposed in every capital case should be excused.' Martin v. State, 548 So.2d 488, 491 (Ala.Cr.App. 1988), affirmed, 548 So.2d 496 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419 [107 L.Ed.2d 383] . . . (1989). Accord, Bracewell v. State, 506 So.2d 354, 358 (Ala.Cr.App. 1986).
 "In this case, defense counsel never requested the trial judge to determine whether any veniremember had a bias in favor of the death penalty. We agree that the better practice is that where the death penalty is a possibility, the trial judge should examine the prospective jurors to ascertain whether any of them would clearly vote either for or against the death penalty regardless of the evidence. United States v. Van Scoy, 654 F.2d 257, 262 (3rd Cir.), cert. denied, 454 U.S. 1126 [102 S.Ct. 977, 71 L.Ed.2d 114] . . . (1981). See Bracewell, 506 So.2d at 358 ('Upon proper request, a jury venire in a capital case should be questioned as to whether or not any venireperson has a fixed opinion in favor of
capital punishment.') However, in the absence of a specific request that the venire be examined on this matter, we find that the trial court's failure to voir dire the venire to determine if any member favors the *Page 1166 
death penalty does not constitute plain error. See Bracewell, 506 So.2d at 358 ('[T]he failure to voir dire the venire to determine if any person favored capital punishment was not error where the jury unanimously recommended a sentence of life without parole.').
 "In this case, the trial judge permitted the attorneys to directly conduct most of the voir dire examination. With regard to the issue under review, defense counsel asked the first panel, 'In the event that you found the defendant guilty of capital murder, is there any of you that feel that the only verdict you could return in the sentencing stage would be death by electrocution?' Defense counsel also made a similar inquiry of the second panel. However, neither of the defendant's two defense counsel made such an inquiry of the third venire panel. Our review shows that no veniremember was challenged by either side based upon an attitude or bias for or against the death penalty. Under these circumstances, we find that the failure of the trial judge to examine the veniremembers concerning whether any member would automatically vote for the death penalty upon the return of a guilty verdict does not constitute plain error. Cf. Turner v. Murray, 476 U.S. 28, 36-37 [106 S.Ct. 1683, 1688, 90 L.Ed.2d 27] . . . (1986) ('We hold that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias. . . . [A] defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry.')."
Kuenzel v. State, 577 So.2d at 484-85 (emphasis in original).
Under the instant circumstances, we refuse to questionKuenzel and to hold that, absent a request, the trial court's failure to ask the proposed question was plain error, especially when, immediately after the trial court asked the venirepersons if anyone had a fixed opinion against capital punishment, it asked if anyone had a fixed opinion against "penitentiary punishment," and no one responded. Appellant has shown no prejudice. See also Smith v. State, 581 So.2d 497, 504
(Ala.Cr.App. 1990) (Part III); Henderson v. State, ___ So.2d at ___ (Part III).
 III
Appellant further contends that the trial court erred in denying his motion to suppress his confession. He argues that his confession was involuntary because, as his testimony showed, he was promised that it would be better for him to make a statement, he was not allowed to bathe for three days, he was confined in "the drunk tank" with two other prisoners for two days, and he felt nervous, threatened, frightened, coerced, and intimidated.
The prosecution, in the hearing on appellant's motion to suppress, presented the following evidence:
On the evening of April 2, appellant was advised of his rights, pursuant to Miranda v. Arizona, by Investigator Wallis. He answered affirmatively to Wallis's inquiry of whether he understood each of these rights, and he stated that he wished to talk. Appellant also signed the rights' waiver form. No one threatened appellant, made any promises, or induced him in any way to make a statement. Appellant revealed that he knew Berry; that he had been staying, for several nights, with Walker; that he had seen the victim on the morning of March 31; and that he and Walker had gone to Alexander City about 1:00 p.m. and did not return to Sylacauga until 5:00 p.m. When Wallis asked about Officer Brasher seeing him with Berry, appellant stated that he wanted to talk to an attorney, and all questioning ceased. (No statement of this interview was introduced before the jury.)
Appellant was then charged with murder and placed in jail. Wallis had no further conversation with appellant until April 7 when Wallis and Wallace were at the jail to talk to Mac Lawhorn. Wallis had gone to make a telephone call in the booking room, which is across the hall from the cell where appellant was being held. As Wallis *Page 1167 
passed the cell, appellant called to him and told him that he wanted to talk to him. Wallis responded that he could not talk to appellant because appellant had asked for an attorney. Appellant replied that "he wanted to waive all that and wanted to talk to us and tell us what had happened" and that he wanted to tell him that he did not shoot that man. Wallis explained that he was busy at that time, so he would "get back with him." Appellant told him to come back.
Wallis saw appellant on that same day at approximately 4:00 p.m. and again informed him of his Miranda rights. Appellant assured Wallis that he understood each right and that he wanted to talk. He also signed the waiver form and wrote on it, "I do not want a lawyer." Wallace and Pope were present at this time. No one threatened appellant, promised him anything, or induced him in any manner to make a statement.
In his first statement, which was tape-recorded, appellant stated that he did not kill Berry, but that his aunt had tried to hire him to do it. (This statement was not introduced to the jury; however, defense counsel alluded to it in cross-examination.) Then, he gave a second tape-recorded statement, which began at 5:40 p.m. During the interval between statements, appellant appeared to be in a good mood and not nervous. Prior to the second statement, appellant stated that Berry was "stupid enough" to get in the truck and go out there. Sometime after the first statement, Sheriff Jerry Studdard was present.
In his testimony, appellant admitted that he initiated the conversations with Wallis on April 7, that he was given hisMiranda warnings, and that he acknowledged his understanding of them. However, he further testified that, during the 15 to 20 minute interim between the first and second statements, Wallis told him that he needed to tell the truth, that what he had stated so far was not the truth, that he needed to "come clean with what [he] had done"; and that "it would be better on [him] and all this if [he] would tell the truth." Appellant testified that these statements made him nervous or frightened and pressured him and that he was scared because they "kept questioning [him] over and over about the same thing." He further disclosed that Wallis informed him that his aunt had made two statements in which she claimed that appellant had killed Berry. He admitted that he was not offered any reward or promise; that Wallis did not threaten him; that he knew he could stop the questioning at anytime; that he knew his Miranda
rights "by heart"; that only one person in the room was visibly armed; and that he was not handcuffed.
To refute appellant's testimony that Wallis told him it would be better on him if he told the truth, Wallis testified that he stated no such thing; Wallace testified that neither she nor anyone in her presence told appellant that it would be better on him; Studdard testified that, while he was in there, he heard no one tell appellant that it would be better on him if he told the truth; and Pope testified that he heard no one say such to appellant.
In deciding the merits of appellant's claim of involuntariness, we look to the totality of the circumstances to determine whether the prosecution met its burden of establishing voluntariness and a Miranda predicate. Bui v.State, 551 So.2d 1094, 1107 (Ala.Cr.App. 1988), aff'd,551 So.2d 1125 (Ala. 1989). The prosecution met this burden with abundant, credible evidence and overwhelmingly refuted appellant's specific testimony that he was told that it would be better on him if he told the truth. After reviewing the circumstances, we conclude that "[appellant] made an independent and informed choice of his own free will, that he possessed the capability to do so, and that his will was not overborne by pressures and circumstances swirling around him,"id. at 1108. We affirm the court's denial of appellant's motion to suppress.
 "The finding of the trial court will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Magwood v. State [, 494 So.2d 124
(Ala.Cr.App. *Page 1168 
1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995 [107 S.Ct. 599, 93 L.Ed.2d 599] (1986)]; Marschke v. State, 450 So.2d 177
(Ala.Cr.App. 1984). Even where there is credible testimony to the contrary, if the evidence is fairly capable of supporting the inference that the rules of freedom and voluntariness were observed, the ruling of the trial judge need only be supported by substantial evidence and not a moral certainty. Chambers v. State, 455 So.2d 1008
(Ala.Cr.App. 1984); Bennett v. State, 409 So.2d 936
(Ala.Cr.App. 1981), cert. denied, 457 U.S. 1137
[102 S.Ct. 2968, 73 L.Ed.2d 1356] . . . (1982)."
Id. at 1107-08. See also Walker v. State, 551 So.2d 449, 451
(Ala.Cr.App. 1989) (wherein the court, quoting United States v.Aldridge, 719 F.2d 368, 373 (11th Cir. 1983), stated that "[a]bsent clear error, the [circuit] court's credibility choices at suppression hearings are binding on this court").
 IV
Appellant also contends that his death sentence "violates Alabama law and the Eighth and Fourteenth Amendments to the United States Constitution as a result of the state arguing to the jury, in the penalty phase of the trial, that it would be improper to reach a verdict in any way based on sympathy." He specifically points to the following closing comments, in the penalty phase, by the prosecutor:
 "[W]hen you come into the jury rail, you just have to shed all the things that you are entitled to have as everyday citizens. You shed sympathies. You shed bias, and you are to judge this based upon the law and the evidence. . . . [W]hen you come into that jury box, you don't come in as everyday citizens. You don't come in as everyday mourners, because you have to shed those things that as all human beings we have a right to have. In a few hours when you go back home, you're entitled to again grasp those things, to feel sorry for people. To do this and do that, but I'll submit to you this: When you're in that jury box, that you're to decide this case based upon the law and evidence and render a true and fair verdict based upon that."
The trial court did not mention mercy or sympathy in its instruction in either the guilt phase or the sentencing phase.
These comments are, in substance, identical to those that we reviewed and found to be permissible in Henderson v. State,583 So.2d at 301 (Part XV), and Kuenzel v. State, 577 So.2d at 494
(Part VIII(C)(1)). In Henderson, the prosecutor, during the voir dire of the venire, commented that the case should be decided by the evidence and the court's instructions on the law, and not by consideration of sympathy. 583 So.2d at 301. During the guilt phase closing arguments, he commented that, when a juror sits, he sheds his sympathy, and that, when he returns home, he can regain it. Id. at 301. In Kuenzel, the prosecutor commented, in the guilt phase closing argument, that defense counsel, in arguing for a verdict of a lesser included offense, was "arguing for sympathy on behalf of the defendant," and also commented that "sympathy is . . . letting a criminal go without proper punishment." 577 So.2d at 495. In the penalty phase closing argument, he urged the jury to "shed" their sympathies, id., and explained that a plea for sympathy had no place in the courtroom, id. at 495.
In finding these comments to be permissible, both theHenderson court and the Kuenzel court relied upon California v.Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).
 "The . . . Court in California v. Brown, . . . faced the question of 'whether an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial violates the Eighth and Fourteenth Amendments to the United States Constitution.' Brown, 479 U.S. at 539 [107 S.Ct. at 838]. . . .
 "The Court said that this charge was 'meant to confine the jury's deliberations to considerations arising from the evidence presented. . . . It serves the useful *Page 1169 
purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors.' Brown, 479 U.S. at 543 [107 S.Ct. at 840]. . . ."
Henderson v. State, 583 So.2d at 301, 302. See also Kuenzel v.State, 577 So.2d at 496.
The Kuenzel court further relied upon the recent case ofSaffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415
(1990), as follows:
 "In Saffle v. Parks, . . . the trial judge instructed the jury at the sentencing phase of the trial as follows:
 " 'You must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence. You should discharge your duties as jurors impartially, conscientiously and faithfully under your oaths and return such verdict as the evidence warrants when measured by these instructions.'
"494 U.S. at ___, 110 S.Ct. at 1259.
 "In Parks, the Supreme Court of the United States rejected the principle that the Eighth Amendment requires that jurors be allowed to base the sentencing decision upon the sympathy they feel for the defendant after hearing his mitigating evidence.
 " 'We thus cannot say that the large majority of federal and state courts that have rejected challenges to antisympathy instructions similar to that given at Parks' trial have been unreasonable in concluding that the instructions do not violate the rule of Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 . . . (1978)], and Eddings [v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 . . . (1982)]. . . .
" '. . . .
 " '. . . It is no doubt constitutionally permissible, if not constitutionally required, . . . for the State to insist that "the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." California v. Brown, 479 U.S., at 545 [107 S.Ct. at 841] . . . (O'CONNOR, J., concurring). Whether a juror feels sympathy for a capital defendant is more likely to depend on that juror's own emotions than on the actual evidence regarding the crime and the defendant. It would be very difficult to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our long-standing recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary. . . .
" '. . . .
 " 'Parks' argument relies upon a negative inference: because we conclude in Brown that it was permissible under the Constitution to prevent the jury from considering emotions not based upon the evidence, it follows that the Constitution requires that the jury be allowed to consider and give effect to emotions that are based upon mitigating evidence. For the reasons discussed above, see supra, at ___, we doubt that this inference follows from Brown or is consistent with our precedents. The same doubts are shared by the clear majority of federal and state courts that have passed upon the constitutionality of antisympathy instructions after Brown.'
"___ U.S. at ___, 110 S.Ct. at 1261-63." 577 So.2d at 497-98.
We finally note that the Kuenzel court recognized the numerous Alabama cases holding that sympathy and mercy are not considerations in the jury's verdict on the evidence. See, e.g.Russell v. State, 38 So. 291 (Ala. 1905); Avery v. State,124 Ala. 20, 22, 27 So. 505, 506 (1900); and other cases cited inKuenzel v. State, 577 So.2d at 496-97.
Upon this authority, we find that the comments asserted by appellant to be improper did not constitute error.[3] *Page 1170 
 V
In the sentencing phase, the trial court instructed the jury that its verdict, finding appellant guilty of murder pursuant to a contract, established the existence of the aggravating circumstance that the capital offense was committed for pecuniary gain, § 13A-5-49(6). Appellant argues that this instruction removed, from the jury's consideration, "an inquiry critical to determine [his] sentence," and it placed the burden of proof on the defense to show that the mitigating factors outweighed the aggravating ones.
The statute provides that the finding and consideration of the relevant aggravating circumstance of § 13A-5-49(6) is not precluded by its inclusion in the definition of the capital offense charged, in this case, under § 13A-5-40(a)(7). Ala. Code § 13A-5-50 (1975). Our statutory scheme also provides the following:
 "At the sentence hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing."
Ala. Code § 13A-5-45(e). See also Ex parte Ford, 515 So.2d 48,52 (Ala. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061,98 L.Ed.2d 1023 (1988).
Recognized by these statutes and implicit in their operation is the fact that the jury, by its verdict, had already made, in essence, the "critical inquiry" of whether the aggravating circumstance, encompassed in the indictment, is present. Thus, the court's instruction did not remove, from the jury's consideration, the determination of whether the aggravating circumstance existed, for that determination had already been made by the jury.
 "The use of 'aggravating circumstances,' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase."
Lowenfield v. Phelps, 484 U.S. 231, 244, 108 S.Ct. 546, 554,98 L.Ed.2d 568 (1988).
Moreover, we have already determined, in Henderson v. State,583 So.2d at 296, 297, and in Kuenzel v. State,577 So.2d at 486 (Part VII), that such instruction does *Page 1171 
not impermissibly shift the burden of proof to the defendant to show why he should not be sentenced to death. See also Henry v.Wainwright, 721 F.2d 990, 996 (5th Cir. Unit B 1983), cert.denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). In this regard, we note that, while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party. Morrison v. State, 500 So.2d 36, 45 (Ala.Cr.App. 1985),aff'd, 500 So.2d 57 (Ala. 1986), cert. denied, 481 U.S. 1007,107 S.Ct. 1634, 95 L.Ed.2d 207 (1987) (relying on Ford v.Strickland, 696 F.2d 804, 818 (11th Cir.), cert. denied,464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983)).
 VI
Appellant contends that the presentence report, considered by the trial court, was highly prejudicial because it included a recommended sentence of death; conclusions regarding the existence of the aggravating circumstances that the offense was committed for pecuniary gain and that the offense was "heinous and atrocious," when compared with other capital offenses; and the conclusion that no statutory mitigating circumstances existed.[4] The record contains no objection to the presentence report.
This court, in Kuenzel v. State, was confronted with a virtually identical situation and found the following:
 "Although we do not approve or condone such a recommendation, we find that even if such recommendation constitutes error, we would find that error harmless in this case. Rule 45, A.R.A.P. '[T]he mere presence of information in the presentence report which should not be considered for the purpose of enhancing punishment is not, pre se, prejudicial.' Johnson v. State, 521 So.2d 1006, 1031 (Ala.Cr.App. 1986), affirmed, 521 So.2d 1018 (Ala.), cert. denied, [488] U.S. [876], 109 S.Ct. 193 [102 L.Ed.2d 162] . . . (1988)."
577 So.2d at 527.
We adopt this holding here, for we are able to find, based on the record before us, the same considerations upon which theKuenzel court relied to support its holding. After reviewing the trial court's orders, which are in compliance with §13A-5-47(d), we are convinced that "the sentence of the trial [court] was based upon [its] own determination of the existence of and [its] weighing of the aggravating and mitigating circumstances," 577 So.2d at 527.
As did the trial court in Kuenzel, the trial court in this case stated, in its order that, after having "carefully read, studied, and considered the Pre-Sentence Report," it concluded that "[n]othing contained in the Pre-Sentence Report would in the opinion of the Court, constitute a mitigating circumstance as provided in either Section 13A-5-51 or 13A-5-52." The trial court entered specific written findings concerning the existence or nonexistence of each *Page 1172 
aggravating circumstance enumerated in § 13A-5-49, of each mitigating circumstance enumerated in § 13A-5-51, and of any additional mitigating circumstances offered pursuant to §13A-5-52. The court further noted the witnesses offered to establish any further nonstatutory mitigation. (Unlike the trial court in Kuenzel, however, the instant trial court did not set out the specific evidence which appellant had offered as nonstatutory mitigating circumstances.)
In concluding its findings in regard to the penalty phase, the instant court stated the following, which is very similar to the Kuenzel trial court's conclusion:
 "The Court having considered the aggravating circumstances, the Pre-Sentence Investigation Report, the absence of mitigating circumstances, the facts of the case in hand as brought forth by the testimony and by the exhibits in the case, and the jury's recommendation of a death sentence by a vote of 11-1, there is only one logical conclusion as to the Defendant's punishment, that conclusion being that he should suffer the punishment of death by electrocution as provided by law, and should be executed for the crime he has committed."
Finally, the instant court, with language virtually identical to that of the Kuenzel order, concluded its determination of sentence with the following:
 "The Court finds that the conduct of the Defendant, James Charles Lawhorn, constituted a brutal, aggravated, merciless, and intentional killing for hire of the victim, William Clarence Berry. The Court further finds that the recommendation of the jury as to the punishment to be imposed was fully justified by the facts and circumstances of the case, together with the process of weighing the aggravating and mitigating circumstances.
 "The Court further finds that the sentence of Death was not recommended by the jury under influence of passion, prejudice, or any arbitrary factor."
Considering these circumstances, "we conclude that the recommendation of punishment by the parole officer was not an influencing factor in the trial [court's] determination of sentence," id. at 528 [ms. 120].[5] Although we strongly advise that this practice not be continued, especially to the extent it was here, we find no plain error under the facts before us.
 VII
Appellant further argues that he was denied a fair trial and a reliable sentencing determination because of prosecutorial misconduct. He raises several specific instances.
(a) Appellant contends that the prosecutor continually asked leading questions on direct examination. Defense counsel objected on numerous occasions, but most, if not all, of his objections were not answered with a ruling. Appellant is correct in his assertion that the prosecutor asked more than several leading questions. We have reviewed the nine times that appellant specifically objected on this ground, and we find no error. In the majority of these instances, the question was unanswered and the prosecutor rephrased the question or the leading question incorporated prior testimony.
 " '[T]he trial judge has discretion to allow some leading questions, especially since prior testimony is simply being repeated.' Brown Mechanical Contractors, Inc. v. Centennial Ins. Co., *Page 1173 431 So.2d 932, 944 (Ala. 1983). 'Whether to allow or disallow a leading question is within the discretion of the trial court and except for a flagrant violation there will not be reversible error.' Bradford v. Stanley, 355 So.2d 328, 331
(Ala. 1978)."
Lynn v. State, 543 So.2d 704, 707 (Ala.Cr.App. 1987), aff'd,543 So.2d 709 (Ala. 1988), cert. denied, ___ U.S. ___,110 S.Ct. 351, 107 L.Ed.2d 338 (1989). See also Kuenzel v. State,577 So.2d at 489 (Part VIII(a)(3)); § 12-21-138; C. Gamble,McElroy's Alabama Evidence §§ 121.05 and .06 (3d ed. 1977).
(b) Appellant contends that the photographs of the victim's body that were introduced into evidence, over his objection, were repetitive, inflammatory, and prejudicial.
 "Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. . . . Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. . . . Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters."
Ex parte Siebert, 555 So.2d 780, 783 (Ala. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990) (quoted inKuenzel v. State, 577 So.2d at 512-513). We have examined the photographs,[6] which depict the body at the scene, and consider them not "so inflammatory or gruesome as to engender passion and prejudice," 577 So.2d at 513. Accordingly, we find that the trial court did not abuse its discretion in admitting these photographs.
(c) Appellant contends that the prosecutor erred in asking one of appellant's witnesses at the sentencing phase, "Do you believe in the death penalty?" Defense counsel's objection to this question was immediately sustained, and the prosecutor did not pursue the subject. We find no error here.
(d) In the sentencing phase, after the prosecutor's closing argument, defense counsel waived closing argument, and the prosecutor gave his final closing remarks. Appellant contends that allowing the prosecutor additional closing remarks was error. It is within the trial court's discretion to allow the prosecutor to close the argument even where the defendant has waived argument. Powell v. State, 224 Ala. 540, 549-50,141 So. 201, 209, rev'd on other grounds, 287 U.S. 45, 53 S.Ct. 55,77 L.Ed. 158 (1932); Sheppard v. State, 172 Ala. 363, 55 So. 514,515 (1911); Landrum v. State, 57 Ala. App. 485, 488,329 So.2d 173, 176-77 (1976). We find no abuse of discretion here.
(e) Appellant also contends that the prosecutor erred in making the following "patriotic" comments in his sentencing phase closing argument:
 "[W]hat separates us from the other societies of this world is simply this: As citizens and as a country, we have always had the ability to do what is right for the necessary protection of our society. . . . We've even have the right to ask the citizens, the men and women of this country —
"[Objection; overruled.]
 "That we have a right as citizens have a duty to this country, and it even goes to asking the young people of this country . . . that they may have to give their life in defense of this country, and I'll submit this to you: If we can demand that of our citizens . . ., we also have the right to demand in the appropriate situation the proper punishment for the worst of it's [sic] crimes. We may honor the dead heroes of this country, we may also execute the worse criminals in this country. . . ." *Page 1174 
In Kuenzel, we reviewed these same comments, in substance, and determined that they do not go beyond the bounds of legitimate argument. 577 So.2d at 503 (Part VIII(C)(9)(d)).
(f) Appellant further contends that the prosecutor introduced the "unconstitutionally obtained statement" of appellant and that he improperly argued that the jury could not consider sympathy in its determination of sentence. We have addressed these contentions in Part III and Part IV, respectively.
 VIII
The prosecution argued, to the jury, that it had presented sufficient evidence to establish the aggravating circumstance that "[t]he capital offense was especially heinous, atrocious or cruel compared to other capital offenses," § 13A-5-49(8), and the trial court charged the jury that it could consider this circumstance. Appellant contends that the charge was error because the circumstance did not apply since the evidence did not support it.
Appellant's narrow issue — that the court's charge on this aggravating circumstance was error because it was not supported by the evidence — is clearly without merit. The unconflicting evidence established that appellant, Mac Lawhorn, and Walker ran Berry down and shot him like an animal. Berry, completely defenseless in an isolated area and in fear for his life, futilely ran from his girlfriend, only to be passed by her truck and to be confronted with the barrel of a shotgun in his face. After being knocked down by the first blast, he managed to get to his feet, only to be shot again. He fell again, and a third shot was fired, hitting the ground in front of where he lay, entangled in vines and underbrush. As he was lying there, trapped and making gurgling noises, appellant walked over to him and shot him three times, two directed at the head area and one directed at the chest area. This evidence clearly warranted the jury's considering the "especially heinous" aggravating circumstance. When a defendant deliberately shoots a victim in the head in a calculated fashion, after the victim has already been rendered helpless by gunshots to the chest, such "extremely wicked or shockingly evil" action may be characterized as especially heinous, atrocious, or cruel. Bushv. State, 431 So.2d 555, 560-61 (Ala.Cr.App. 1982), aff'd,431 So.2d 563 (Ala), cert. denied, 464 U.S. 865, 104 S.Ct. 200,78 L.Ed.2d 175 (1983) (citing Hargrave v. State, 366 So.2d 1, 5
(Fla. 1978), cert. denied, 444 U.S. 919, 100 S.Ct. 239,62 L.Ed.2d 176 (1979)). See also Hallford v. State, 548 So.2d 526,542-43 (Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert.denied, ___ U.S. ___, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
While we find that the trial court's charge was not erroneous on the ground asserted by appellant, we do find that it was erroneous, for it did not contain a limiting definition of the "especially heinous" aggravating circumstance. In Maynard v.Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372
(1988), the Supreme Court held that the mere words "especially heinous, atrocious, or cruel," without more, are unconstitutionally vague under the Eighth Amendment because they fail "adequately to inform juries what they must find to impose the death penalty and as a result leave them and appellate courts with the kind of open-ended discretion which was held invalid in Furman v. Georgia, 408 U.S. 238
[92 S.Ct. 2726, 33 L.Ed.2d 346] (1972)," id. 486 U.S. at 361-62,108 S.Ct. at 1858. The Court recognized that it is well established that "the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action." Id. at 362,108 S.Ct. at 1858.
Unlike the state court reviewed in Maynard v. Cartwright, Alabama has restricted its "heinous, atrocious, or cruel" circumstance to application only in a crime "of such a nature that it is 'conscienceless or pitiless' and 'unnecessarily torturous to the victim,' " Ex parte Whisenhant, 555 So.2d 235,244 (Ala. 1989, cert. denied, ___ U.S. ___, 110 S.Ct. 3230,110 L.Ed.2d 676 (1990) *Page 1175 
(quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981)).[7] We note that this limited construction was first adopted by this court in Jacobs v. State, 361 So.2d 607, 633 (Ala.Cr.App. 1977), aff'd, 361 So.2d 640 (Ala. 1978), cert. denied,439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979), from the Florida Supreme Court's definition set forth in State v. Dixon,283 So.2d 1 (Fla. 1973), cert. denied sub nom. Hunter v. Florida,416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974), and that Florida's construction was upheld, as constitutionally valid and sufficient in Proffitt v. Florida, 428 U.S. 242, 255-56,96 S.Ct. 2960, 2968, 49 L.Ed.2d 913 (1976).
In the instant case, the trial court's entire instruction on this circumstance consisted of the following:
 "Another one that you could consider but is not proven by your verdict is that the capital offense was especially heinous, atrocious, or cruel, compared with other capital offenses as set out in Subdivision 8 defining aggravating circumstances."
The court instructed the jury in the bare terms of the statute, § 13A-5-49(8). This instruction gave the jury no guidance concerning the meaning of any of the terms; the jury was not instructed on the meanings of these words in the context of a capital crime. Compare Hallford v. State, 548 So.2d at 541-43;Bui v. State, 551 So.2d 1094, 1119-20 (Ala.Cr.App. 1988),aff'd, 551 So.2d 1125 (Ala. 1989). "There is nothing in these few words, standing alone, that implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." Maynard v. Cartwright, 486 U.S. at 363,108 S.Ct. at 1859 (quoting Godfrey v. Georgia, 446 U.S. 420, 428,100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980)).
Although we consider the jury's finding of the aggravating circumstance to be invalid because it was not guided by sufficient instruction, we find no imperative to reverse and remand this cause for resentencing. In Clemons v. Mississippi,494 U.S. 738, ___, 110 S.Ct. 1441, 1441, 108 L.Ed.2d 725
(1990), the Court held that "the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on invalid or improperly defined aggravating circumstances either by reweighing of the aggravating and mitigating evidence or by harmless error review."
Our supreme court held, in Ex parte Williams, 556 So.2d 744
(Ala. 1987), that the trial court, upon its finding that an aggravating circumstance on which the jury was instructed was invalid, cannot cure such error by disregarding that circumstance and finding, upon reweighing, that the remaining aggravating circumstances outweigh the mitigating evidence. InWilliams, the jury had been improperly instructed that it could consider the fact that the capital offense was committed by a person under sentence of imprisonment, § 13A-5-49(1); however, it was subsequently established that the appellant was not on probation or parole at the time the crime was committed. In holding that the sentence of death could not be affirmed, our supreme court reasoned as follows:
 "The Court of Criminal Appeals reasoned that, because the trial court, as the ultimate sentencing authority, did not consider illegal evidence ('the incorrect aggravating circumstance') in the sentencing *Page 1176 
hearing, the trial court's error in permitting the jury to consider such evidence in arriving at its recommendation of the death sentence was harmless. The basic flaw in this rationale is that it totally discounts the significance of the jury's role in the sentencing process.
 "The legislatively mandated role of the jury in returning an advisory verdict, based upon its consideration of aggravating and mitigating circumstances, can not be abrogated by the trial court's errorless exercise of its equally mandated role as the ultimate sentencing authority. Each part of the sentencing process is equally mandated by the statute (§§ 13A-5-46, -47(e)); and the errorless application by the court of its part does not cure the erroneous application by the jury of its part. For a case consistent with our holding, see Johnson v. State, 502 So.2d 877 (Ala.Cr.App. 1987). To hold otherwise is to hold that the sentencing role of the jury, as required by statute, counts for nothing so long as the court's exercise of its role is without error.
 "We emphasize that our holding that the Court of Criminal Appeals erred in its application of the harmless error rule is based upon independent state law grounds and upon statutory construction. We reverse as to the judgment of sentence and remand to the Court of Criminal Appeals with instructions to remand this cause for a new sentencing hearing before a jury and before the court as required by law."
Id. at 745 (emphasis in original).
In consideration of this rationale, we presume that this court, in reviewing the propriety of a death sentence after a jury recommendation based, in part, on an invalid aggravating circumstance, cannot resort to the first analysis recognized by the Maynard Court: a reweighing, by the appellate court, of the valid aggravating and the mitigating circumstances.
However, we find no impediment to prevent us from reviewing the insufficient instruction for harmless error. TheClemons Court, in discussing this alternative stated the following:
 "Even if under Mississippi law, the weighing of aggravating and mitigating circumstances were not an appellate, but a jury function, it was open to the Mississippi Supreme Court to find that the error which occurred during the sentencing proceeding was harmless. See, e.g. Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792
[100 L.Ed.2d 284] . . . (1988). As the plurality in Barclay v. Florida, [463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983)], opined, the Florida Supreme Court could apply harmless error analysis when reviewing a death sentence imposed by a trial judge who relied on an aggravating circumstance not available for his consideration under Florida law:
 " 'Cases such as [those cited by the petitioner] indicate that the Florida Supreme Court does not apply its harmless-error analysis in an automatic or mechanical fashion, but rather upholds death sentences on the basis of this analysis only when it actually finds that the error is harmless. There is no reason why the Florida Supreme Court cannot examine the balance struck by the trial judge and decide that the elimination of improperly considered aggravating circumstances could not possibly affect the balance. . . . "What is important . . . is an individualized determination on the basis of the character of the individual and the circumstances of the crime." Zant [v. Stephens, 462 U.S. 862,] 879[, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235
(1983)] (emphasis in original). Id., [463 U.S.] at 958, 103 S.Ct., at 3429.' "
___ U.S. at ___, 110 S.Ct. at 1450.
In Alabama, "the harmless error rule does apply in capital cases at the sentence hearing." Ex parte Whisenhant,482 So.2d 1241, 1244 (Ala. 1983). However, it "is to be applied with extreme caution in capital cases," and this caution must be observed when reviewing error in the penalty phase, for "[a]fter all, it is the penalty which distinguishes these cases from all other cases." Ex parte Whisenhant, 482 So.2d 1247,1249 (Ala. 1984). *Page 1177 
To determine whether the trial court's failure to instruct properly was harmless error, the Clemons Court suggests one of two inquiries: (1) whether beyond reasonable doubt the sentence would have been the same had the "especially heinous" circumstance not been considered by the jury at all, or (2) whether beyond reasonable doubt the result would have been the same had the circumstance been properly defined in the jury instructions. See also Henry v. Wainwright, 721 F.2d 990, 995
(5th Cir. 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374,80 L.Ed.2d 846 (1984) (wherein the court, in holding harmless the trial court's failure to instruct that aggravating circumstances must be found beyond a reasonable doubt, stated that "[f]or the failure to give the instruction to be harmless, the evidence must be so overwhelming that the omission beyond a reasonable doubt did not contribute to the verdict").
For purposes of our review of this case, we employ the secondClemons inquiry. There is no question, at all, that, had the jury been properly instructed, it would still have returned a recommendation of death because the facts presented to the jury established, beyond any doubt, that this crime was especially heinous, atrocious, or cruel when compared to other capital offenses. The evidence of this circumstance is overwhelming; the facts so conclusively establish it, that no rational jury, properly instructed, could have found otherwise. The evidence is unconflicting that appellant directly participated in a conscienceless, pitiless, and torturous murder. Berry's last minutes were obviously filled with terror, fear, and knowledge that his death was imminent, and he experienced a high degree of prolonged pain before his death. All of this was accomplished by appellant with complete indifference — complete indifference to Berry's pain and terror and complete indifference to the value of human life, which he found to be worth $50. Clearly, this evidence sets this crime apart, for the degree of heinousness, atrociousness, and cruelty of this offense exceeds that which would be common to all capital offenses. By any standard acceptable to civilized society, this crime was outrageously wicked and shockingly evil. In fact, appellant admitted, during the sentencing phase, that as the victim lay entangled in the underbrush and unable to talk, but gurgling, he repeatedly shot the victim and, at the time, did not care whether the victim died or not.
We note that this situation does not involve the jury's consideration of misleading, inaccurate, or illegal information or evidence. Rather, it is a case where the aggravating circumstance, overwhelmingly supported by admissible evidence, was rendered invalid because it was unconstitutionally presented to the jury. We find that the jury's improper consideration of this aggravating circumstance and possibly improper consideration by the trial court did not render appellant's sentencing fundamentally unfair. It is unnecessary to vacate appellant's sentence because we are convinced beyond a reasonable doubt that, had the circumstances been properly narrowed, the jury would have recommended the same sentence and the trial court would have imposed the same sentence. We hold this, even in the face of our recognition of the utmost importance of insuring that a death sentence not be based on arbitrary and capricious action. While we, in theory, would be very hesitant to find harmless error in the submission to the jury of an unconstitutionally defined aggravating circumstance, we find that the facts of this case support such an application beyond a reasonable doubt.[8]
 IX
During the sentencing phase, appellant presented evidence from a juvenile probation officer who testified that, while she counseled appellant when he was 17 years old, he was always cooperative and polite; *Page 1178 
that he was bothered "quite a bit" about his feeling of rejection by his father; that his father showed no interest in him; and that he did not get along with his step-father at all. Appellant's junior high school principal testified that appellant was an average student who had very few discipline records and who had never failed a grade. Appellant's older sister testified that their parents divorced when appellant was three years old; that appellant's father is an alcoholic; that their first stepfather whipped appellant everyday, until the step-father was shot and killed; that their second stepfather, who is an alcoholic, beat appellant while he was married to their mother for one-and-a-half years; that their present step-father is mean; that appellant lived with his father for a short time, but was neglected because his father stayed drunk; that appellant had lived with her intermittently; and that appellant frequently kept her children, who "worship" him. Appellant's sister also testified that Walker, who was 44 years old at the time, "had her way of getting what she wanted"; that she bought drugs for appellant; and that "you could talk [appellant] into anything," especially women. Appellant's mother described the same family background and asked the jury to have mercy on appellant.
Appellant testified that he had done wrong and asked the jury to have mercy on him. He further explained that he would do whatever Walker asked. He admitted that he did not care, at the time, whether Berry died or not.
The prosecution introduced evidence that appellant has one conviction for possession of burglary tools, two convictions for second degree theft, and two convictions for third degree burglary.
Upon this evidence and the evidence introduced at trial, the trial court concluded that two aggravating circumstances existed: the capital offense was committed for pecuniary gain, § 13A-5-49(6), and it was especially heinous, atrocious, or cruel compared to other capital offenses, § 13A-5-49(8). The court found no mitigating circumstances.
Pursuant to A.R.A.P. 45A, we have searched the record for any plain error or defect, and we have found none that has or probably has adversely affected any substantial right of appellant. Pursuant to § 13A-5-53(a), we have found no error adversely affecting the appellant's rights in the sentencing proceeding, and the trial court's findings concerning the aggravating and mitigating circumstances are clearly supported by the evidence.
In determining that the death sentence is proper for this appellant, §§ 13A-5-53(b) and (c), we first find that the crime for which he was indicted and convicted is properly punishable by death, § 13A-5-40(a)(7). Second, the record contains no evidence or indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. In fact, the prosecutor is to be commended, for it is obvious that he had, as his first objective, insuring that appellant had a fair trial. Third, our independent weighing of the aggravating circumstances and no mitigating circumstances indicates that death is the proper sentence. We note here that, in our reweighing, we having included the "especially heinous" circumstance, as narrowed by our limiting definition of prior decisions. We further note that we, too, have not found any non-statutory mitigating circumstances in appellant's family background, in his proclaimed weakness to Walker's alleged domination, or in his lack of discipline problems in his younger years. Finally, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and appellant. See, e.g., Henderson v. State. We have also considered the death sentence for Walker and the sentence of life imprisonment without parole for Mac Lawhorn, and we find that appellant's sentence is appropriate. See Wright v.State, 494 So.2d 726, 739-41 (Ala.Cr.App. 1985), aff'd,494 So.2d 745 (Ala. 1986), cert. denied, 479 U.S. 1101,107 S.Ct. 1331, 94 L.Ed.2d 183 (1987). Even assuming that Mac Lawhorn deserved the death penalty, we would not be justified in *Page 1179 
reducing appellant's death sentence. See id. at 741.
Accordingly, the judgment of the circuit court convicting appellant of the capital offense for murder for hire and sentencing him to death is affirmed.
AFFIRMED.
All Judges concur.
[1] Prior to the instant trial, Altion Maxine Walker was convicted of the capital offense of murder for hire and sentenced to death. Her appeal is awaiting submission to this court (7 Div. 164). After the instant trial, Mac Lawhorn was convicted of the capital offense of murder for hire and sentenced to life imprisonment without possibility of parole. His conviction and sentence have been affirmed by this court. (Ms. 89-107, September 21, 1990).
[2] The prosecutor did ask those of one panel of 18 who had not expressed opposition to capital punishment the following:
 "[W]ould the fact that you are not opposed to capital punishment prevent you from making a fair and impartial decision as to the guilt or innocence of the Defendant. . . . Is there anyone here that is so in favor that they would impose it in every case regardless of what the evidence may be?"
No one replied.
[3] We have also reviewed the prosecutor's other references to sympathy and find them to be permissible. In the voir dire of one venire panel, the prosecutor stated the following:
 "Sometimes when you have young Defendants, . . . you tend to kind of want to let sympathy get involved in the case. Is there anyone . . ., that during the guilt stage of this trial that can't totally put that out [of] your mind and render a fair and impartial verdict based on nothing but the evidence . . ., and Judge's charges as to the law?"
In questioning another panel, after asking if anyone who, in deciding guilt or innocence, could not disregard appellant's age and after explaining that age could be a factor in the sentencing stage, the prosecutor stated, "I think the Judge will charge you that sympathy and bias and that sort of thing doesn't have any place in the courtroom." In questioning the last panel about what standard of proof the prosecutor must meet, the prosecutor stated, "[S]ympathy plays no part in a verdict."
In the rebuttal closing argument of the guilt phase, the prosecutor stated the following:
 "I'll tell you what arguing for a lesser included offense is under this evidence. That's nothing but asking for sympathy, and I tell you what sympathy is, is letting criminals go without proper punishment, and the reason I'm up here and have so much experience is because we are reaping the benefit of past sympathies in this day's society. If a man commits a crime, he ought to be punished for the crime he commits, and sympathy hasn't got any place in this courtroom."
These comments were clearly in response to defense counsel's closing argument. Defense counsel had argued that although appellant admitted, in his statement, to killing Berry and although money was paid, appellant must have been motivated by some undisclosed reason, coercion, or overwhelming influence; that, it follows that he does not deserve the death penalty or life imprisonment without possibility of parole; and that the only way either of those punishments can be avoided is for the jury to return a guilty verdict to the lesser included offense of murder.
We note that no objection was made to any of these comments, including the specific ones appellant asks us to review.
[4] The report specifically states the following:
"Circumstance # 6 would apply, in my opinion, in that this offense was committed for pecuniary gain. Circumstance # 7 also certainly applies because of the fact that this crime was heinous and atrocious when compared to other crimes of a similar nature. In addition to these aggravating circumstances, I feel his prior record indicates a propensity toward crime. Regarding mitigation, in my opinion, probably none of those listed in the code have any applicability. Certainly Mr. Lawhorn was not exceptionally young and, in my opinion, can not fall back on the age factor in mitigation. It is also my opinion that he does not appear to show any remorse over having killed this man. I don't personally believe he really cares one way or another. Since Charles Lawhorn has been incarcerated, I have had some intermittent contacts with him and he has, in my opinion, displayed a lackadaisical attitude about the whole affair. It also appears that the statement he gave to sheriff's department investigators is one where he is extremely matter of fact and shows virtually no remorse. Obviously he does not feel that human life amounts to much in that the most he could hope to get out of this murder was $50. I personally have no doubt that under a similar set of circumstances, he would probably commit the same offense again. In view of the overall circumstances of this case, it is respectfully recommended that the court concur with the jury recommendation and sentence this defendant to death by electrocution."
[5] See also Henderson v. State, 583 So.2d at 303, where, in disposing of the same issue, the court held the following:
 "Section 13A-5-47, Code of Alabama 1975, provides that a presentence report will be prepared prior to sentencing. The presentence report informs the court of 'the guideline categories that the officer believes apply to the particular case, the kinds of sentences and the sentencing range believed to apply, any mitigating or aggravating circumstances.' Project: Nineteenth Annual Review of Criminal Procedure, 78 Geo.L.J. 1240 (1990).
 "The presentence report was prepared for the judge's benefit; it was not shown to the jury. The trial judge evaluated the material in the report, considered the jury's recommendation, and sentenced the appellant to death. His findings are clearly substantiated by the record."
[6] The photographs that we reviewed are now exhibits in the record on appeal of Walker's case. We are confident that they are the photographs (or copies) admitted in the instant case, for the description of each particular numbered photograph, given in the instant record, describes the photograph with the corresponding number in the Walker exhibits.
[7] The attorney general asserts, in answer to appellant's narrow issue, that our supreme court, in Ex parte Whisenhant, has implicitly recognized this definition, specifically the term "torture," to encompass the victim's mental agony resulting from an awareness of sure and impending death. The Whisenhant
court, in upholding the trial court's finding, focused on the victim's awareness of her impending death.
In White v. State, [Ms. 8 Div. 473, August 24, 1990] ___ So.2d ___, ___ (Ala.Cr.App. 1990), we relied on Whisenhant to hold, "Evidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel." See also Copeland v. State,457 So.2d 1012, 1019 (Fla. 1984), cert. denied, 471 U.S. 1030,105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). We do note that the Maynard Court stated, "We . . . do not hold that some kind of torture or serious physical abuse is the only limiting construction of the heinous, atrocious, or cruel aggravating circumstance that would be constitutionally acceptable." 486 U.S. at 365, 108 S.Ct. at 1859-1860.
[8] Appellant offered no objection to the trial court's instruction on the "especially heinous" circumstance instruction or to the trial court's findings on this circumstance. Having determined that the error was harmless, we find also that it was not plain error. See Freeman v. State,555 So.2d 196, 210 (Ala.Cr.App. 1988), aff'd, 555 So.2d 215
(Ala. 1989), cert. denied, ___ U.S. ___, 110 S.Ct. 2604,110 L.Ed.2d 284 (1990).